(No. 57737.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. SCOTT KELLICK, Appellant.

*Opinion filed May 25, 1984.*

164

Charles M. Schiedel, Deputy Defender, and Carroll J. King, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Mark L. Rotert and James E. Fitzgerald, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE UNDERWOOD delivered the opinion of the court:

In a jury trial in the circuit court of St. Clair County, defendant, Scott Kellick, was found guilty of the murder of his half-sister, Jaynee Kellick. Pursuant to section 9—1(d) of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(d)), the court conducted a separate sentencing hearing to determine whether a sentence of death should be imposed, and defendant was subse-

quently sentenced to death. The trial court stayed imposition of the sentence (87 Ill. 2d R. 609(a)) pending direct appeal to this court (Ill. Const. 1970, art. VI, sec. 4(b); Ill. Rev. Stat. 1981, ch. 38, par. 9—1(i); 87 Ill. 2d R. 603).

Testimony from defendant, a St. Clair County deputy sheriff, and various Belleville police officers established that at approximately 4 a.m. on July 17, 1982, defendant went to the St. Clair County sheriff's office to confess to the murder of Jaynee Kellick. The sheriff's office contacted the Belleville police, and two officers were dispatched to transfer defendant to the Belleville police station. Defendant was not interrogated until after he had arrived at the Belleville station and had received *Miranda* warnings. However, one of the officers responsible for transferring him testified that, although there was no attempt to initiate any conversation, defendant volunteered the following incriminating statements: "I hope they give me the electric chair," and "Will you do me a favor, shoot me." After arrival at the Belleville police station, defendant met with Officers Rokita and Moore, who had been assigned to investigate Jaynee Kellick's murder, was given the *Miranda* warnings, and signed a typewritten form waiving those rights. Then, according to testimony of the two investigating officers, defendant's responses to their questions were summarized in a written statement, which defendant signed after it was read aloud to him.

According to the statement, defendant was driving his car along North Second Street in Belleville during the early evening hours of July 16, 1982, when he ran out of gas. He had no money to buy gas, so he walked to his maternal grandparents' home at 400 North Second Street, where his sister lived, to borrow money from them. When no one answered his knock and after he saw that their two cars were gone, defendant assumed

that they were away for the evening. After entering through an unlocked front door, he called out to announce his presence and, hearing no response, he decided to steal and then sell some of his grandfather's guns. He took a butcher knife from a kitchen drawer, placed it in his back pocket, and then removed a hammer and screwdriver from another drawer to pry open the padlocked closet where he knew the guns were kept. He had just finished prying open the closet lock when he heard a noise and turned to find his sister standing in the doorway, wearing only a T-shirt. She did not speak to him but instead turned and ran upstairs. Defendant ran after her and followed her into her bedroom. He asked whether she was going to tell their grandfather that he had broken into the closet to steal the guns and Jaynee replied that, yes, she was going to tell. Defendant then ordered her to say nothing about the incident and Jaynee, while stepping backward, lost her balance and fell to the floor. Defendant then stabbed her in the neck with the butcher knife he had taken earlier. He began to walk away but, thinking he heard a noise from the victim, returned and stabbed her repeatedly. He then picked up a table and threw it.

Defendant ran back down the stairs to the closet, took three of his grandfather's handguns, placing them and some bullets in a plastic trash bag, and returned the hammer and screwdriver to the drawer where he had found them. He threw the knife outside the kitchen door and, taking the guns with him, walked to his mother's home at 707 North Second. Before entering the house, he set the bag of guns on the lawn and washed the blood from his hands with a garden hose. He then explained to his mother that he had run out of gas and asked to borrow her van. He drove around in the van for a couple of hours before returning to his mother's home, where a group of relatives had gathered after hearing that his

sister had been killed. He remained there for an indefinite period of time and then drove to the home of his fiance, Mary Neilson, where he was living. He changed clothes there, and when Mary's child had fallen asleep the couple returned to defendant's mother's house, where relatives were still gathered outside. While Mary was inside the house, defendant told his family that he had murdered Jaynee. When Mary came back outdoors, the two went back to her home and defendant, unable to sleep, told his fiance that he had killed his sister and that he had decided to go to the county jail to confess to the crime.

The court denied defendant's motion to suppress his statement and the case proceeded to trial on October 25, 1982. Testimony from Belleville police officers and photographs admitted into evidence corroborated much of defendant's statement. Officer Klee testified that he was on patrol the evening of July 16 and responded to a call at about 10:30 p.m. directing him to the grandparents' address. There he discovered the victim's body, clad only in a T-shirt and lying in a pool of blood, in a second-floor bedroom. He also observed and photographed an overturned table in the room. Officer Schmulbach testified that he, too, was on patrol in a separate car the evening of July 16 and also went to the grandparents' address in response to a radio dispatch at approximately 10:30 p.m. While investigating the scene, he found and photographed a butcher knife with its blade stuck in the ground near the kitchen door of the grandparents' home. Officer Rokita's testimony also revealed that, after he took defendant's statement, he directed Officer Gramc to further investigate the crime scene.

Officer Gramc stated that he found the hammer and screwdriver in the drawer which defendant had described earlier in the questioning and that he viewed the closet door with the torn hasp. His investigation also re-

vealed a screen missing from a bathroom window, and directly below this window, outside the house, he had found a metal crate, underneath which was a sheet of plastic. He checked both the plastic and the metal crate for footprints and found none. He confirmed that police estimated that the murder occurred between 9:40 p.m. and 10 p.m. on July 16.

Officer Rokita also participated in the investigation. He testified that he found and photographed a garden hose outside defendant's mother's residence. He further stated that on July 17 he recovered a pair of jeans and a pair of boots from defendant's fiance's residence, which were transmitted to the Illinois State Crime Lab, along with samples of defendant's blood and hair. In searching the grandparents' house he noticed that part of the bathroom window had been removed.

St. Clair County coroner, James Radden, testified that blood and hair samples were removed from the victim's body and sent to the State Crime Lab, where they were analyzed by Dennis Aubuchon, a forensic serologist, along with the items Officer Rokita transmitted. Mr. Aubuchon testified that he found blood on the knife discovered outside the grandparents' home and on the boots and jeans recovered from defendant's fiance's residence, and that he detected hair on the knife and jeans. He then performed a whole blood typing on the blood samples from the victim and defendant. The victim's blood was found to be type A and defendant's blood type O. Aubuchon identified the blood found on the knife, jeans and boots as type A blood. He also stated that his testing indicated that the hair found on the knife was similar to the victim's and dissimilar from defendant's.

The last witness to testify for the State was Dr. Beverly Psai, the pathologist who performed the autopsy on the victim's body. She stated that there were 32 stab wounds on the victim's neck, anterior and lateral chest

wall and extremities, back and fingers. These wounds varied in length from one-quarter inch to three-and-one-half inches and up to three inches in depth. Dr. Psai further testified that the victim's death was due to acute massive bleeding from the right jugular vein, which had been severed. She also stated that five of the other 31 wounds were life-threatening. Photographs of the victim's body, the knife, the pried-open closet, the drawer containing the hammer and screwdriver, and the garden hose at defendant's mother's home were admitted into evidence, and the State rested.

Defendant then took the stand in his own behalf. He testified that after lunch on July 16 he worked on his car at his mother's home, trying unsuccessfully to fit new rims on his tires, and then drove to his father's house in East St. Louis to ask him for help with the tires. Defendant also asked his father for some amphetamines, which his father did not have, offering him two 750-mg pills of Placidyl instead, a substance which Blakiston's Gould Medical Dictionary describes as a sedative-hypnotic drug, with a "short duration of action" (Blakiston's Gould Medical Dictionary 1057 (1979)). His father also offered him a couple of cans of beer, which defendant accepted before leaving to go back to his mother's. En route to Belleville he took one of the Placidyls. He returned around 4 p.m., worked on his car, left to eat dinner at his fiance's home, and then returned to his mother's to help her move furniture and do further work on his car. He took the second Placidyl and left his mother's again, this time with the intention of stealing a set of tires from the person who sold him the ill-fitting rims.

Defendant was driving his car toward West Main on North Second Street when he ran out of gas. He left his car and began walking toward his grandparents' home at 400 North Second, when two women who lived near his grandparents spotted him and one asked if something

was wrong with his car. Defendant explained the situation and continued on to his grandparents' address, where he knocked on the front door, but nobody answered. He then noticed that their cars were gone and, concluding that no one was at home, he began walking back to his mother's. It was then that defendant spotted his father driving a pickup truck. He waved for him to stop and asked to borrow money for gas, but his father told him he had none. Defendant's father asked him if he knew of anyone who had any guns. Defendant at first responded that he did not, but then, upon seeing his car stalled on the street he became angry at being out of gas and without money, so he told his father that his grandpa had some guns and he offered to break into the house to get them. They parked the pickup near the grandparents' home and then walked down an alley that bordered on their backyard. Defendant's father pulled a crate under the bathroom window, which defendant then stood on to remove the screen and jump through the window.

Once inside, defendant shut the window so his grandparents would be less likely to notice the missing screen and as he did so, he was startled by a noise behind him. He then heard his father whispering to him from the kitchen and defendant asked him why he had come in the house. His father told him not to worry about it and directed defendant to get some tools to pry the lock off the closet where the guns were stored. As defendant placed on a table the hammer and screwdriver he had found, he turned and saw his father holding a knife. Defendant asked his father why he had a knife and was again told not to worry about it and asked to find something in which to carry the guns. Defendant found a plastic trash bag in the kitchen and began walking to the bedroom where the guns were kept when he noticed his father walking in the opposite direction, so he asked him

where he was going. The response again was not to worry about it and that defendant should "get the guns and hurry up." Defendant then pried open the locked closet door, took three guns, and put them in the plastic bag. He shut the door and attempted to make the lock appear untouched before replacing the hammer and screwdriver in the kitchen drawer.

Defendant then began looking for his father. When no one answered his whispers, he set the bag of guns down, went upstairs and saw his sister lying on the bedroom floor with blood all over her body. This sight stunned him until his father turned to him, wielding the knife, and defendant then began to cry. He asked his father why he did it and backed away as his father began stabbing at him. Defendant shoved a table in his father's direction, knocking him to the floor and freeing the knife. Defendant picked it up and his father then ran from the room. Defendant first thought of throwing the knife at him but, thinking his father might come back after him with it, thought better of the idea. He shook his sister's leg and since she did not move, he assumed that she was dead.

Defendant went back downstairs in time to see his father driving away in the truck. He threw the knife outside and retrieved the bag of guns. Defendant was mad and wanted to "get" his father, so he sat down for a few minutes to try to decide what to do. He finally picked up the gun bag and ran down the alley, throwing the bag under some bushes. He stopped running at his mother's house and, while under a streetlight, spotted some blood on his right hand, so he washed it, using his mother's garden hose. Defendant explained to his mother that he had run out of gas and asked to borrow her van. He drove back to pick up the guns and then parked the van on the Belleville town square, where he loaded the guns. Defendant then drove to his father's house and waited

for him to come home.

He did not see his father come in, so he left and returned to his fiance's home. She informed him that his sister was dead and defendant began to cry again. He changed his clothes and, at his fiance's suggestion, the two went to his mother's house, where various relatives were gathered. Once he arrived there, defendant felt nervous, so his fiance gave him several sleeping pills. They left again for the Neilson home shortly after defendant's uncle, who was searching for something in the van defendant had been driving, discovered the guns.

As they prepared to go to sleep, defendant admitted to his fiance that he was in the house when Jaynee was killed but stated that he did not kill her. Defendant could not recall whether he told his grandmother and mother, who subsequently appeared at the Neilson residence, whether he was responsible for Jaynee's death because he was in a "doped-up" condition from the sleeping pills at that time. After their arrival, defendant decided to go to the county sheriff's office to confess to the crime. He did so because he was afraid his father "might come back and get him" and he went there, as opposed to the Belleville police station, because he was afraid the Belleville police would beat him. He was very sleepy during the time he was questioned by the Belleville police. Defendant concluded his testimony by reaffirming that he did not kill his sister, but that his father, Charles Kellick, did.

On cross-examination he acknowledged that his signature appeared on all pages of his confession to the Belleville police, but stated that he was not aware of what he had signed and that he did not tell the police the information it contained. He denied asking a Belleville police officer to "do me a favor and shoot me" or expressing the hope that he would be electrocuted. Defendant

stated that he failed to seek medical care for his sister because he thought she was dead and because he had decided to concentrate on "getting his dad." He at one point stated that he did not take a "whole lot" of drugs the day of the murder, but later when questioned as to whether he was "high on drugs," defendant responded positively. He further stated that he was with his father between the hours of 9 a.m. and noon on the day of the murder. Following cross-examination, the defense rested.

The State called several witnesses in rebuttal, all of whom contradicted defendant's testimony in regard to his father's whereabouts on July 16. Charles Kellick, defendant's father, acknowledged that he had four prior felony convictions and that he was currently on probation. He testified that he was employed by General Railroad and Equipment Services and that he was at work between the hours of 7 a.m. and 3:30 p.m. on July 16. From approximately 8 to 10:30 p.m., he was at the home of his mother-in-law, Bernice Hudson. On cross-examination, he acknowledged that his brother owned a pickup truck, but noted that he did not have access to it because his brother lived in New Orleans. He also stated that he had not resided at his home in East St. Louis since February of 1982 and that he did not leave his mother-in-law's residence at any time on the evening of July 16.

The vice-president of personnel for General Railroad, Cynthia Thompson, identified Charles Kellick's time card for July 16, which indicated that he had punched in at 6:24 a.m. and out at 3:30 p.m., as one of the type that was regularly used in the course of business at this company. She also identified the initials "E.M." on the time card as those of the shift foreman, Ed Mayberry, and stated that his initials served as a verification of the hours that Charles Kellick had worked. Ed Mayberry testified that Charles Kellick was one of 15 persons

whom he supervised on July 16 and that he would not have initialed the time card had Kellick not been at work during the time specified on the card.

Charles Kellick's mother-in-law, Bernice Hudson, testified that between the hours of 8 and 11 p.m. on July 16, Charles Kellick was at her home. Lois White, a friend of Mrs. Hudson's and a frequent visitor in her home, testified that she was there the evening of July 16 as was Charles Kellick.

The State also called James Wentworth, a forensic scientist for the Illinois Department of Law Enforcement and Officer Moore of the Belleville police. Wentworth testified that he was unable to obtain any usable fingerprints from the knife allegedly used to commit the murder. Moore stated that following the questioning session the morning of July 17, he took two Polaroid photographs of defendant, which depicted defendant as free from any signs of physical injury. He testified that no officer had touched defendant. The trial concluded on October 27 and the jury returned a verdict of guilty after 2½ hours of deliberation. Defendant waived his right to a jury at the death penalty hearing, which the court proceeded to conduct the same day.

Prior to the sentencing hearing, the State informed defendant that it intended to rely exclusively on the section 9—1(b)(7) aggravating factor (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(7)) to prove beyond a reasonable doubt that defendant was eligible for the death sentence. Section 9—1(b)(7) at that time provided that a defendant who had attained the age of 18 years and been found guilty of murder could be sentenced to death if "the murdered individual was *under 16 years of age* and the death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty." (Emphasis added.) Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(7).

At the hearing, the State indicated that it would rely

on the evidence previously adduced at the trial, which included defendant's testimony that he was 20 years old and a stipulation that the victim was 15 years and 6 months of age at the time of her death. The State also introduced photographs of the victim's body that had not been admitted at trial and certified copies of defendant's two theft convictions. The only prosecution witness at the sentencing hearing was Elizabeth Reichert, the victim's high school civics teacher. Her testimony was offered to prove that the victim was a very promising child, a fact of which her brother must have been aware, according to the State, and thus, the State contended, demonstrated further the brutal and heinous nature of the crime. The victim's teacher testified that, academically, Jaynee was among the top 5% of all the students she had taught in her 15-year career and that Jaynee had the potential to go on to college.

Defendant's evidence consisted of testimony from his maternal grandparents and his mother that if defendant did, in fact, kill Jaynee they forgave him and did not wish that he receive the death sentence.

In his motion in arrest of judgment or, in the alternative, for a new trial, defendant grounded his request, in part, on additional evidence discovered by the Belleville police after trial which, he asserted, tended to corroborate his testimony that his father accompanied him to the grandparents' home the night of the murder. Attached to the motion were two police reports, which indicated that Robert Wayt, of 320 North Second Street in Belleville, observed defendant, accompanied by a person Wayt described as an older, balding, white male, at the grandparents' address about 20 minutes before he heard someone yell, "She's dead, there's blood all over." Wayt, who was out on bond at the time, left the area when he heard police cars in the vicinity, and failed to report this incident earlier because he did not think anyone would

believe him. Wayt was unable to identify defendant's father when police showed him a series of 12 photographs of white males in which Charles Kellick's photo was included.

On December 10, 1982, the trial court denied defendant's post-trial motion, finding that the newly discovered evidence would not have changed the verdict. The court found that the State had proved beyond a reasonable doubt the existence of the section 9—1(b)(7) aggravating factor and that there was no evidence to bring defendant within the provisions of any of the statutory mitigating factors. Sentence was then pronounced.

Defendant first argues that the trial court erred in failing to conduct an evidentiary hearing based upon the allegation in his post-trial motion that the statement of Robert Wayt substantiated defendant's testimony, creating a reasonable doubt as to defendant's guilt. He urges that this court reverse defendant's conviction and remand the case for a new trial or, in the alternative, remand for a full evidentiary hearing to establish the materiality of Wayt's statement.

In *People v. Molstad* (1984), 101 Ill. 2d 128, this court noted the standard for determining whether evidence discovered after the conclusion of trial warrants a new trial:

> " 'To warrant a new trial, the new evidence *must be of such conclusive character that it will probably change the result on retrial,* that it must be material to the issue but not merely cumulative, and that it must have been discovered since the trial and be of such character that it could not have been discovered prior to trial by the exercise of due diligence.' " (Emphasis added.) 101 Ill. 2d 128, 134, quoting *People v. Baker* (1959), 16 Ill. 2d 364, 374.

Although the Wayt statement corroborates defendant's trial testimony that he was accompanied by an older white male when he was outside his grandparents' home the eve-

ning of the murder, it does not confirm defendant's testimony that this other man was his father. Wayt's inability to identify Charles Kellick's photograph is not surprising since at the time he saw the two figures there would have been very little light available, if any, to discern unfamiliar facial features. But the fact remains that even if he had identified the man as defendant's father, a substantial amount of other evidence indicated that Charles Kellick did not leave his mother-in-law's residence the evening of the murder. The trial judge, who heard three witnesses testify to this effect and also observed defendant's demeanor during his testimony, found that Wayt's statement would not have changed the verdict. In view of this other evidence, we cannot conclude that the court's decision constituted an abuse of discretion (see *People v. Miller* (1980), 79 Ill. 2d 454, 465; *People v. Reese* (1973), 54 Ill. 2d 51, 59) under the standard discussed in *Molstad*.

Defendant next raises several arguments, all of which urge that his death sentence be vacated due to various errors that allegedly occurred during his sentencing hearing or due to certain constitutional infirmities defendant suggests exist in the death penalty statute, but in view of the result we reach, we need not address these issues.

Our analysis of the propriety of defendant's sentence requires a rather extensive review of the legislative history of section 9—1(b)(7), the statutory aggravating factor under which defendant was sentenced to death. In the form originally passed by the General Assembly in 1981 as Public Act 82—677 (1981 Ill. Laws 3549), this section made a defendant eligible for a death sentence when he killed a child under 16 years of age in a particularly brutal or heinous fashion. This original version of section 9—1(b)(7) became law on October 29, 1981, with a prospective effective date of July 1, 1982, when both houses of the General Assembly voted to override the Governor's amendatory veto. (See 5 H.R.J., 82d Ill. Gen. Assem., 1981 Sess. 6625 (here-

inafter House Journal); 3 S.J., 82d Ill. Gen. Assem., 1981 Sess. 4791 (hereinafter Senate Journal).) In his amendatory veto message, the Governor had made two recommendations. He first suggested that the victim's age be lowered to "under 12 years" to correspond with a then recently enacted amendment to the "Factors in aggravation" section of the Unified Code of Corrections which permits imposition of a more severe sentence if the defendant has been convicted of a felony committed against a person under 12 years of age. (See Ill. Rev. Stat. 1981, ch. 38, par. 1005—5—3.2(b)(3)(i).) In his second recommendation, the Governor proposed various changes in the section 9—1(b)(6) and 9—1(b)(8) aggravating factors, matters not addressed in the legislation submitted to him. See 5 H.R.J., 82d Ill. Gen. Assem., 1981 Sess. 6508—09 (letter from Gov. James R. Thompson to the Members of the House of Representatives (Sept. 24, 1981)).

The legislative history indicates that the General Assembly agreed in substance with the changes the Governor had suggested and voted to override his veto only to avoid setting a dangerous precedent by accepting recommendations legislators considered to be beyond the scope of the Governor's veto power under article IV, section 9(e), of the Illinois Constitution (Ill. Const. 1970, art. IV, sec. 9(e)). Official records from each chamber support this analysis. In the House on October 15, 1981, the day that chamber voted to override, several of the original sponsors introduced a new bill (see 5 H.R.J. 6665) incorporating substantially all of the changes suggested in the Governor's veto message, including lowering the victim's age to "under 12 years" in the section 9—1(b)(7) aggravating factor. Section 2 of the bill specified as its effective date July 1, 1982, the same effective date fixed in Public Act 82—677, which contained the "under 16" age limitation. (See 1982 Ill. Laws 2927—31.) In the Senate, debate preceding the vote on the motion to override reveals that the motion passed because

the members of that chamber believed that the Governor had exceeded the scope of this amendatory veto power in suggesting changes unrelated to the matters addressed in the bill submitted to him. (See 82d Ill. Gen. Assem., Transcript of Senate Proceedings, Oct. 29, 1981, at 46-49.) Thus, on October 29, 1981, the day of the Senate override, the "under age 16" limitation, which was to take effect prospectively on July 1, 1982, was adopted (see Ill. Const. 1970, art. IV, sec. 9(c)), not because the legislators disagreed with the Governor's recommendation to lower the age, but because they wished to preserve the procedure they considered mandated by the Constitution's amendatory veto provisions.

The second bill, Public Act 82—1025, which incorporated the Governor's changes, was passed by the General Assembly on June 24, 1982, but was not signed by the Governor until December 15, 1982. The progress of the bill had been slowed by an amendment added in the Senate, which provided that all death sentences be carried out by lethal injection. (1 Legislative Synopsis & Dig., 82d Ill. Gen. Assem., 1982 Sess. 1088.) This additional provision prompted the Governor to once again exercise his amendatory veto power. (See 3 H.R.J., 82d Ill. Gen. Assem., 1982 Sess. 4784 (letter from Gov. James R. Thompson to the Members of the House of Representatives (Nov. 5, 1982)).) However, this time both houses voted to accept his suggestion that the death-by-lethal-injection provision be deleted (see 3 H.R.J., 82d Ill. Gen. Assem., 1982 Sess. 4893; 3 S.J., 82d Ill. Gen. Assem., 1982 Sess. 3864-65), and the Governor certified this change on December 15, 1982, pursuant to article IV, section 9(e), of our State constitution. Five days earlier, defendant had been sentenced to death under the version of section 9—1(b)(7) contained in Public Act 82—677.

We recognize that "An Act in relation to the effective date of laws" (Ill. Rev. Stat. 1983, ch. 1, pars. 1201

through 1206), enacted in 1971 in response to article IV, section 10, of the 1970 State Constitution, provides the general rules for determining when an act becomes effective. Section 1(b) directs that where a bill is passed, as here, prior to July 1, and the effective date stated in the bill is prior to the date the bill becomes law, that effective date is no longer controlling and the bill takes effect upon becoming a law. (Ill. Rev. Stat. 1983, ch. 1, par. 1201(b).) Thus, under the general rule, since the stated effective date of July 1, 1982, preceded by several months the date on which the Governor certified the change in the bill and it became law (see Ill. Rev. Stat. 1981, ch. 1, par. 1205; Ill. Const. 1970, art. IV, sec. 9(e)), the second version of the section 9—1(b)(7) aggravating factor, which made defendants eligible for the death penalty if their victims were under 12 years of age, was not yet in effect during the time defendant Kellick was tried and sentenced.

However, this court's decisions have recognized that the common law of retroactive construction continues to supply an exception to the policy expressed in the statute. (See *People ex rel. American Federation of State Employees v. Walker* (1975), 61 Ill. 2d 112, 118; *Doran v. Cullerton* (1972), 51 Ill. 2d 553, 557.) *United States Steel Credit Union v. Knight* (1965), 32 Ill. 2d 138, 142, provides a summary of the common law in this area:

> "Retroactive legislation is not favored, and as a general rule statutes are construed to operate prospectively *unless the legislative intent that they be given retroactive operation clearly appears from the express language of the acts, or by necessary or unavoidable implication.* (Emphasis added.)

Applying this rule in *Knight*, we determined that a statute signed into law on July 16, 1963, providing that all credit unions pay an annual supervision fee to the State, should operate retrospectively, encompassing the entire 1963 calendar year. See also *People ex rel. Kubala v. Kinney*

(1962), 25 Ill. 2d 491, 495; *People ex rel. Kroner v. Abbott* (1916), 274 Ill. 380, 387.

Applying the common law rule stated in *Knight*, we find the legislative history of Public Acts 82—677 and 82—1025 replete with evidence that the General Assembly intended the latter version of section 9—1(b)(7) to operate retrospectively. We therefore hold that because the legislature intended Public Act 82—1025 to be retroactively effective to July 1, 1982, 15 days prior to the offense, this case must be governed by the version of section 9—1(b)(7) contained in that act (Ill. Rev. Stat., 1982 Supp., ch. 38, par. 9—1(b)(7)). Since defendant's victim was 15 years of age and this version makes a defendant eligible for the death sentence only where the victim is under 12 years of age, defendant's death sentence must be vacated.

For the reasons stated, the judgment of conviction is affirmed and the sentence of death is vacated. The cause is remanded to the circuit court of St. Clair County for the imposition of a new sentence other than death.

*Judgment of conviction affirmed;*
*sentence vacated; cause remanded,*
*with directions.*