Docket No. 77078–Agenda 2–September 1996.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. GERALDINE SMITH, Appellant.

Opinion filed June 19, 1997.

JUSTICE NICKELS delivered the judgment of the court:

Defendant, Geraldine Smith, was charged with first degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 9–1(a)(1)) and conspiracy to commit murder (Ill. Rev. Stat. 1987, ch. 38, par. 8–2(a)) arising from the June 23, 1987, shooting death of Valerie McDonald. Following a jury trial in the circuit court of Cook County, defendant was convicted of both counts. The trial court denied defendant's post-trial motion, which sought a new trial to introduce exculpatory testimony of nine new witnesses. Defendant waived her right to be sentenced by the jury and the trial judge determined defendant was eligible for the death penalty because she procured another to commit murder for money. See Ill. Rev. Stat. 1987, ch. 38, par. 9–1(b)(5). After considering factors in aggravation and in mitigation, the trial judge determined that there were no mitigating factors sufficient to preclude the imposition of the death sentence and, accordingly, sentenced defendant to death. See Ill. Rev. Stat. 1987, ch. 38, par. 9–1(h). Defendant's death sentence has been stayed pending direct appeal to this court. Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d Rs. 603, 609(a).

Codefendant Eddie Williams was tried separately from defendant and was found guilty of first degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 9–1(a)(1)), conspiracy to commit murder (Ill. Rev. Stat. 1987, ch. 38, par. 8–2(a)), and armed violence (Ill. Rev. Stat. 1987, ch. 38, par. 33A–2). On appeal, this court affirmed Williams' convictions but vacated his death sentence. 
People v. Williams
, 161 Ill. 2d 1 (1994). On remand, Williams was resentenced to natural life imprisonment. The present appeal involves only Geraldine Smith's convictions and sentence.

BACKGROUND

On June 23, 1987, the victim, Valerie McDonald, was shot at point-blank range in the head. Two days later, she died as a result of the gunshot wound. The victim's husband, Louia McDonald, and two daughters, LaChina and Lakeya, 16 and 8 years old, respectively, witnessed the shooting. The investigation of the shooting culminated in the arrest and indictment of the defendant, Geraldine Smith, who was revealed to be involved in an extramarital affair with the victim's husband, Louia McDonald. Also arrested for their involvement in the shooting were defendant's friend, Marva Golden, and the hired shooter, Eddie Williams. Golden subsequently pleaded guilty to first degree murder.

Testimony at defendant's trial revealed the following. LaChina McDonald testified that on the night of the murder she and her sister, Lakeya, attended a church service with their mother, Valerie McDonald. Louia McDonald, the victim's husband, picked the family up at church about 9:15 p.m. and drove home to their apartment building on North Winthrop Avenue in Chicago. As Louia circled the block looking for a parking space, LaChina noticed a man with a ponytail standing on the corner watching their car. Louia parked the car across the street from their building and the girls exited the vehicle, followed by Louia and their mother. As Louia and the girls entered the vestibule of the building, Valerie trailed behind on the front sidewalk. LaChina saw the man with the ponytail approach her mother and raise his hand towards her mother's head. She then heard a gunshot and saw her mother collapse to the sidewalk. The man fired two shots towards the entrance of the building and then turned and fled south. As LaChina went to her mother, Louia ran after the man.

Daniel Postlethwait testified that at about 10 p.m. on the night of the murder he and his nephew were walking to his car, which was parked across the street from the parking lot of a Dominick's grocery store. At that time, Postlethwait heard gunshots coming from the direction of North Winthrop Avenue. He turned in that direction and saw an African-American man with a ponytail running towards him with another man in pursuit. The man with the ponytail entered the passenger side of a burgundy Buick Regal that was idling in the entrance to the parking lot. The man said something to the driver and the Buick drove through the parking lot and left the area.

Phillip Mannion and Raymond Kamenski, Chicago police detectives, testified that they arrived at the scene of the shooting around 10 p.m. At that time, Valerie McDonald was lying on the ground with blood coming out of her right ear. The detectives testified that they spoke with Louia, who told them that the shooter escaped in a burgundy Buick Regal that looked identical to defendant's car. The detectives further testified that Louia also disclosed that, although he was married to the victim, the defendant was his girlfriend.

The two detectives testified that they went to defendant's house at about 2 a.m. on June 24. There they found defendant at home, but her car was gone. Defendant voluntarily accompanied the detectives to Area 6 police headquarters, where she told them that Marva Golden had borrowed her car the previous evening. Shortly thereafter, another detective drove defendant home and found that Golden had arrived there with defendant's car. Golden and defendant returned to the station with the detective, where defendant gave them permission to search her car and house. The detectives accompanied defendant to her home and evidence technicians processed her car. Although defendant was permitted to stay at her home, Golden remained in custody. Detective Kamenski testified that at about 10 p.m. on June 24, he spoke with Golden and she identified Eddie Williams as the person who shot Valerie McDonald. Subsequently, Williams was taken into custody. LaChina McDonald identified Williams from a lineup as the man who shot her mother.

Marva Golden testified that she had known defendant, Geraldine Smith, for 24 years, having first met when defendant was dating Golden's uncle. Golden testified that in early 1986, she learned that defendant was pregnant and that Louia McDonald was the father of the baby. Golden first met Louia at defendant's house some time in 1986 when Louia was staying with defendant. Although Golden knew Louia had a family, she was unaware at that time that he was married.

Golden testified that while defendant was pregnant, she would often stay with defendant and help her around the house. Golden had her own room in defendant's home and often stayed there on weekends. Near the end of defendant's pregnancy, during the fall of 1986, Golden observed defendant and Louia argue frequently. Golden testified that defendant was tired of Louia going back and forth between his wife's home and defendant's home. Golden further testified that defendant wanted Louia to leave his wife, but Louia responded that he was having financial problems and needed more time. Golden testified that defendant gave birth to a son late in 1986, whom she named Louia McDonald, Jr. Golden further observed that Louia visited defendant less frequently during 1987.

Golden testified that in June 1987, she began working at a restaurant close to defendant's house. In order to reduce her commute to work, Golden often stayed with defendant. On Sunday, June 21, Golden left work at 2:30 p.m. and went to defendant's house. Golden testified that defendant was angry and said that she wanted Valerie McDonald to die. Golden testified that defendant walked through the house repeating that she wanted “the bitch dead.”

Golden testified that at approximately 6 p.m. that same day, she and defendant left Louia Jr. with defendant's sister, Louise. Defendant borrowed Louise's car and drove Golden to the north side of Chicago. Golden testified that when they reached North Winthrop Avenue, defendant pointed out the victim's house and again said that she wanted Valerie dead. Defendant circled the block and slowed the car as she passed the victim's building again. At this time, they did not see Louia McDonald's car outside the building. Defendant then drove towards her home on the west side of Chicago. Golden testified that during the trip defendant repeatedly said, “I want the bitch dead.”

Golden testified that later that same evening, she and defendant returned to the victim's neighborhood in defendant's car. During this trip, defendant spotted Louia's car parked outside the apartment building. Golden testified that upon seeing Louia's car, defendant hit her own steering wheel in anger and again repeated that she wanted “the bitch dead.” Golden further testified that the women returned to defendant's house, where defendant said that she was “tired of this shit.” Golden testified that defendant then asked her if she knew anyone who could help her and Golden replied that she did.

Golden testified that the next morning, Monday, June 22, defendant repeated her wish that Valerie McDonald were dead. Golden testified that defendant said she would pay $500 to have the victim murdered and asked Golden if she knew anyone who would do it. Golden again answered affirmatively. That evening, Golden drove defendant and Louia Jr. in defendant's car to the south side of the city in order to find someone to kill the victim. Golden noticed that defendant had brought several cans of soda with her for the trip.

Golden testified that she drove to a tavern at 59th and Honore Streets. Outside the tavern, Golden saw Eddie Williams, whom she knew because Williams had dated her sister. Golden exited the car and approached Williams while defendant remained in the parked car with the baby. Golden testified that she asked Williams if he would kill Valerie McDonald for Geraldine Smith, who was willing to pay $500. Golden testified that Williams responded by saying, “Let's ride.” Golden further testified that Williams also agreed to give her $100 of the money. Williams then got into the back seat of defendant's car. Golden noticed that Williams rested his hands on the car's T-top as he entered the car.

Golden testified that she then drove towards her cousin's home. During the drive, Golden noticed that defendant drank from one of the soda cans. After they arrived at the apartment of Golden's cousin, Olivia Norris, Golden went upstairs to the apartment alone while the others waited in the car. Olivia was at home with her two young sons. Golden testified that she asked Olivia if she knew where she could get a gun for defendant. Golden testified that Olivia replied that she had a gun but it was not for sale. Olivia sent her older son, LaKevin, outside to bring defendant up to the apartment. Soon, LaKevin returned with defendant and her baby.

Golden testified that defendant then entered a bedroom with Olivia, while LaKevin, Golden, and the baby remained in the living room. When the two women emerged from the bedroom, Olivia handed Golden a pillowcase which contained a gun. Golden and defendant then returned to the car and Golden handed Williams the gun. Golden drove defendant and the baby home. Golden testified that defendant told her and Williams that she wanted “the bitch dead,” to which they both replied that they would take care of it.

Golden testified that she and Williams then traveled to the victim's neighborhood. Upon arriving there, they noticed that the McDonalds' car was gone, so they returned the gun to Olivia Norris. Golden told Olivia that they would be back for the gun the next day. Golden drove Williams to the south side and let him out at a street corner. She then returned to defendant's house late that evening and told defendant that she and Williams would “take care of” Valerie McDonald the next day.

Golden further testified that on Tuesday, June 23, she left defendant's house in defendant's car about 5:30 p.m. and drove to the south side to get Williams. After picking up Williams, Golden returned to Olivia Norris' apartment and retrieved the gun. Golden then drove to the victim's neighborhood and parked the car. Golden and Williams walked towards the McDonalds' apartment building and waited on the corner. Shortly thereafter, Golden saw the McDonalds' car being driven down the street and pointed it out to Williams. Golden then walked back to defendant's car and drove to a nearby grocery store parking lot and waited with the engine running.

Golden testified that Williams soon ran up to the car and opened the passenger door. Golden testified that as Williams entered the car he said, “Let's get the *** out of here.” Golden drove directly back to defendant's house. Golden testified that during the ride, Williams said, “I hit the bitch in the head. I think she is going to die.” Golden further testified that Williams also told her that the victim had children with her.

Golden testified that upon arriving at defendant's house, Williams went down into the basement while she talked to defendant. Golden testified that defendant asked her if Williams had taken care of it, to which Golden replied, “Pay him the money.” Golden testified that defendant responded, “I hope the bitch die.” Golden testified that defendant then took her car keys from Golden and left, saying that she was going to get more money. About 15 minutes later, defendant returned home and gave Golden $500. Golden gave Williams the money, who returned $100 to Golden as they had agreed.

Golden testified that she then drove Williams back to the south side in defendant's car. She dropped him off at a street corner and then returned the gun to Olivia Norris. Golden then met her sister at a bar and had some drinks. After leaving the bar, Golden spent some time alone at the lakefront before returning to defendant's house. Finding no one at defendant's home, Golden went to bed. Golden testified that the next morning, Wednesday, June 24, defendant returned home with two police detectives. The detectives asked Golden to return with them to the police station. On the way to the station, Golden and defendant sat in the back seat of the police car. Golden testified that defendant whispered to her that she should not say anything because the police knew nothing.

That evening, Golden was still at the police station when she discovered that the police allowed the defendant to go home. Golden told Detective Kamenski that she was surprised because defendant “was the cause of all this” and the murder was defendant's idea. Golden then directed the police to the neighborhood where she had dropped off Williams and he was eventually apprehended. Subsequently, Golden was driven back to the police station, where she telephoned Olivia Norris. Golden told Olivia to give the gun to the police. Golden then accompanied the police to Olivia's apartment, but the gun was not recovered at that time.

Golden also testified concerning her agreement with the State. In exchange for her testimony against defendant, the State was going to recommend a prison term of 20 years for Golden. On cross-examination, Golden testified she was aware that without the agreement it was possible that she could receive the death penalty. In addition, Golden was aware that with credit for time served and good behavior she could be released within seven years.

On cross-examination, Golden admitted that when she was first questioned by police detectives she denied any involvement in the murder. Golden denied that she spoke to Iris Harrison, another inmate at the Cook County jail, regarding her case. Finally, Golden denied seeing people at defendant's house on June 21, the Sunday before the murder.

On redirect examination, Golden testified that in July 1987, while she was incarcerated in the Cook County jail, defendant visited her. Golden testified that defendant asked her to write Louia McDonald and tell him that defendant had nothing to do with Valerie's murder. Golden testified further that defendant told her that if she wrote the letter, defendant would deposit a “big lump sum of money” into Golden's account at the jail's commissary. Golden testified that she did not respond to this request.

Assistant State's Attorney Joel DeGrazia testified that on June 25, 1987, he was present when Golden made a court-reported statement regarding the shooting of Valerie McDonald. DeGrazia read the statement to the jury, which was largely consistent with Golden's trial testimony. On cross-examination, DeGrazia acknowledged that Golden never told him that defendant entered Olivia Norris' apartment with her to obtain the gun.

LaKevin Norris testified that in the summer of 1987 he was about to enter the fifth grade. At that time, he and his younger brother lived with his mother, Olivia Norris. LaKevin testified that in late June 1987, he saw his cousin, Golden, and defendant pull up in front of his building in a burgundy-colored car. LaKevin accompanied Golden up to his apartment and then returned outside and spoke with defendant. LaKevin testified that he asked defendant what her name was and she replied “Geraldine.” LaKevin then went up to the apartment with defendant. He remembered the women staying for about 15 or 20 minutes. The next evening, Golden returned to LaKevin's house with two men. LaKevin identified Eddie Williams as one of the men who was with Golden.

A medical examiner testified that he performed an autopsy on Valerie McDonald. He noted a gunshot entrance wound near the upper portion of her right ear and recovered a small caliber bullet from near her left temple. He determined that the gunshot wound was the cause of death. Detective David Ryan testified that on June 25, 1987, he recovered a gun wrapped in a pillowcase from Olivia Norris. Olivia showed Ryan the abandoned garage where the gun was hidden. A firearms expert testified that ballistics tests showed that the gun fired the bullet that killed Valerie McDonald.

A fingerprint expert testified that Williams' fingerprints were discovered on the T-top and passenger side door glass of defendant's car. Golden's fingerprints were found on the car's rearview mirror and driver's side door glass. In addition, both Williams' and defendant's fingerprints were found on an empty soda can found in the back seat of defendant's car.

Robert Clark, a Chicago police officer, testified regarding an altercation which occurred between the victim and defendant about one year before the murder. On July 4, 1986, Clark responded to a report of an auto theft in progress at 6100 North Winthrop Avenue. When he arrived, defendant was sitting alone in Louia McDonald's car. As Clark approached the car, he saw defendant bend over. After defendant exited the car, Valerie McDonald exited the apartment building and began arguing with defendant. Soon, the argument escalated into a physical altercation in which the two women kicked and punched each other until Clark separated them. Clark testified that he could not tell which of the women started the altercation. After separating the two women, Clark searched Louia's car. On the floor of the front seat he discovered a cosmetic bag which contained a loaded .25-caliber pistol. He found no identification in the bag. In the back seat of the car, Clark also found defendant's purse, which contained a hammer.

Detective Mannion also testified regarding his efforts to locate Louia McDonald in order for him to testify at defendant's trial. On February 28, 1990, Louia did not appear in court. Mannion found Louia at home and made arrangements to bring him and his daughter Lakeya to court the next morning. Nevertheless, the next day Mannion found that Louia was not home. Louia was also not at work and his daughter was absent from school. Mannion was unable to locate Louia or his daughter in time for them to testify at trial.

In her defense, defendant called Olivia Norris, who testified that she was Golden's cousin and had known her most of her life. Olivia also had known defendant most of her life because defendant had been involved in a relationship with Olivia's uncle. Olivia testified that in the evening of June 22, 1987, Golden came to her apartment with a man Olivia did not know. Golden introduced the man only as “Eddie.” Olivia testified that Golden asked her to get the “piece,” referring to a gun that Golden had brought to Olivia's apartment over a week earlier. Golden took the gun and left with Eddie only to return with it several hours later. Olivia testified further that Golden returned the next evening with Eddie and another man, and again took the gun. A few hours later, Golden returned alone and dropped off the gun. After a few days, the police came and took the gun from Olivia. On cross-examination, Olivia said that she thought defendant had come to her apartment with Golden on one of those occasions because she recalled seeing and talking with defendant at some time that week. Olivia also admitted that on June 25, 1987, she told the police that defendant had been to her apartment with Golden earlier that week.

Iris Harrison testified that she was in custody in the Cook County jail during the summer of 1987. At that time, Harrison became acquainted with both Golden and defendant. In late June or early July 1987, Harrison was in the waiting room of the jail's infirmary when Golden entered the room with another inmate and began talking to Harrison. Harrison testified that during the conversation, Golden described her murder charge in detail.

Harrison testified that Golden told her that she picked up a man because they were going to “knock off a stain,” which Harrison understood to mean that they intended to rob somebody. Harrison testified that Golden stated that when she and the man reached their destination they had to wait for the people to arrive. When the people did arrive, the man jumped out of the car and went right after them. Harrison testified that Golden said the man was supposed to shoot another man, but instead shot the man's wife. Harrison further testified that after making this statement, Golden commented that if you want something done right, you should do it yourself. Harrison testified that at this point in the conversation, Golden turned and looked towards defendant, who was sitting in the adjacent room, and said that defendant was “like a fish out of water.” Harrison testified that Golden then commented that if she was going “to go down and take that yellow bus ride,” then she was going to take defendant with her. Harrison testified that the “yellow bus ride” means going to the penitentiary. Harrison then testified that Golden also said that defendant had nothing to do with the murder. Harrison also testified that she later became friends with defendant and became protective of her.

Defendant then offered evidence of an alibi for Sunday, June 21, 1987, which Golden testified was the day she accompanied defendant on two trips to the McDonalds' neighborhood after defendant revealed her desire to have Valerie McDonald killed. Several of defendant's relatives testified to a large family gathering that was held at defendant's home on that day. Among them, Enis Mabry, defendant's mother, testified that she arrived at defendant's house at approximately 3 p.m. Enis testified that other family members and Marva Golden were also present at defendant's house that day. Enis stayed until well after dark, leaving some time between 9 p.m. and 10 p.m. Enis did not see defendant leave the house at all that day. Enis specifically recalled the day because she was visiting Chicago from her home in Mississippi during June 1987. In addition, she remembered the day because it was the Sunday preceding defendant's arrest.

Defendant also offered alibi evidence for Monday, June 22, 1987, which Golden testified was the day the murder plan was conceived and Williams was recruited to perform the shooting. The testimony of defendant's relatives accounted for defendant's activities of that day from 12:30 p.m. until late afternoon. In addition, the boyfriend of defendant's niece testified that defendant was at her home at 10 p.m. that evening when he arrived to give his girlfriend a ride home.

Finally, defendant offered an alibi for Tuesday, June 23, 1987, the day of the murder. Defendant's doctor and several of her relatives accounted for defendant's activities during that day. In addition, two of defendant's relatives testified that they were with defendant at her home the evening of the murder until approximately 11:15 p.m. They testified that at no time that evening did they see Marva Golden or Eddie Williams at defendant's house.

The defense also called two police detectives who testified that they had interviewed Golden during the early stages of the investigation of Valerie McDonald's murder. During these interviews, Golden denied any involvement in the murder and did not mention defendant's involvement. Defendant did not testify on her own behalf.

Closing arguments were held and the jury returned a verdict of guilty. Subsequently, defendant filed a post-trial motion requesting a new trial, grounded on the newly discovered testimony of nine witnesses. The trial court denied defendant's motion. Defendant waived her right to a jury at the death penalty hearing. The trial court found defendant eligible for the death penalty and, after considering evidence in aggravation and mitigation, the trial court sentenced defendant to death.

Additional facts will be presented where required for a thorough discussion of the issues.

ISSUES

Defendant raises 13 issues in her appeal, the first four of which concern trial error. Defendant argues: (1) she was not proven guilty beyond a reasonable doubt; (2) she was denied a fair trial because the prosecutor elicited testimony of the police investigation which implied that a nontestifying codefendant implicated her; (3) she was denied a fair trial because during closing arguments the prosecutor improperly used impeachment evidence as substantive proof that she was present when the murder weapon was obtained; and (4) the trial court erred in denying her request for a new trial based on newly discovered evidence.

Defendant's next two issues concern trial counsel's performance. Defendant argues here that: (5) she was denied effective assistance of counsel because her trial attorney failed to cross-examine a witness regarding incentives the prosecution had promised in exchange for his testimony; and (6) she was deprived of conflict-free counsel because her trial attorney had bribed judges and because he faced drug charges and an impending federal indictment.

Defendant also raises five issues concerning sentencing. Defendant argues: (7) defendant's waiver of her right to a jury for capital sentencing was constitutionally invalid under the sixth, eighth, and fourteenth amendments because she was advised that the jurors had to be unanimous in a decision not to impose death; (8) she was deprived of conflict-free counsel because her attorney also represented a State's witness during her capital sentencing proceedings; (9) she was denied effective assistance of counsel because her trial attorneys failed to investigate and present substantial mitigating evidence concerning her behavior after incarceration; (10) her death sentence is excessive given the substantial mitigation evidence presented and lack of aggravation evidence; and (11) her death sentence is unreasonably disparate from the natural life term of imprisonment imposed on Williams, her codefendant.

Finally, defendant raises two arguments concerning the constitutionality of the Illinois death penalty statute. Defendant argues that the statute: (12) places a burden of proof on a defendant which precludes meaningful consideration of mitigation; and (13) does not sufficiently minimize the risk of arbitrarily imposed death sentences.

I. TRIAL ISSUES

A. Sufficiency of Evidence

Defendant first contends that the State failed to prove her guilty beyond a reasonable doubt. Defendant argues that the prosecution's case was based almost entirely on the inherently suspect and uncorroborated testimony of codefendant Marva Golden, who is not credible because she is a self-confessed murderer and liar who received substantial incentive to testify falsely and implicate defendant. Moreover, defendant contends that Golden's testimony was significantly contradicted by defendant's numerous witnesses who testified to defendant's alibi and good character.

A criminal conviction will not be set aside on review unless the evidence is so unsatisfactory or improbable that there remains a reasonable doubt of the defendant's guilt. 
People v. Byron
, 164 Ill. 2d 279, 299 (1995). When considering a challenge to the sufficiency of the evidence of a defendant's guilt, it is not the function of this court to retry the defendant. 
People v. Steidl
, 142 Ill. 2d 204, 226 (1991). Rather, determinations of the credibility of witnesses, the weight to be given to their testimony, and the reasonable inferences to be drawn from the evidence are responsibilities of the trier of fact. 
Steidl
, 142 Ill. 2d at 226. The relevant question on review is whether, after viewing all of the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. 
Byron
, 164 Ill. 2d at 299.

A careful review of the record reveals that a rational trier of fact could have readily found defendant guilty of murder and conspiracy to commit murder beyond a reasonable doubt. Codefendant Marva Golden testified to the gradual breakdown in the relationship between defendant and Louia McDonald. Defendant was angry over Louia's lack of commitment to her and their son and she became increasingly jealous of the relationship Louia continued with his wife, Valerie. Golden testified that defendant's anger and jealousy finally culminated in defendant's decision to have Valerie killed. At defendant's request, Golden helped her recruit a killer and obtain a gun. Defendant provided her car so that Golden could drive Williams to the murder scene and help him escape after the shooting. Golden testified that after the shooting, defendant gave Golden and Williams $500 for murdering Valerie.

We recognize defendant's contention that the testimony of an accomplice witness “has inherent weaknesses” (
People v. Hermens
, 5 Ill. 2d 277, 285 (1955)) and should be “accepted only with utmost caution and suspicion” (
People v. Newell
, 103 Ill. 2d 465, 470 (1984)). Nevertheless, the testimony of an accomplice witness, whether corroborated or uncorroborated, is sufficient to sustain a criminal conviction if it convinces the jury of the defendant's guilt beyond a reasonable doubt. See 
People v. Young
, 128 Ill. 2d 1, 51 (1989). Moreover, a conviction shall not be reversed simply because the defendant claims a witness was not credible. 
Byron
, 164 Ill. 2d at 299. In the present case, Marva Golden provided a complete account of the conspiracy to murder Valerie McDonald, including her own role in the commission of the crimes. Moreover, Golden's trial testimony was corroborated by the court-reported statement she gave shortly after the murder occurred. This statement tended to rebut the inferences, suggested by the defense, that Golden had a motive to testify falsely in this case and that her trial testimony was a recent fabrication. See 
People v. Shum
, 117 Ill. 2d 317, 340-41 (1987). The jury was well aware of Golden's initial denial of involvement in the murder and her subsequent confession. In addition, the jury knew of Golden's plea agreement with the State, and it was instructed that accomplice testimony is subject to suspicion (see Illinois Pattern Jury Instructions, Criminal, No. 3.17 (3d ed. 1992)). The jury chose to believe Golden's testimony.

Contrary to defendant's assertion, the State was able to provide independent corroboration of many important aspects of Golden's testimony. Police officer Clark's testimony confirmed the growing animosity and potential for violence between Valerie and defendant. Defendant's own family members substantiated defendant's romantic relationship with Louia and the resulting birth of their son, Louia Jr. LaChina McDonald testified that she first noticed Eddie Williams, the shooter, on the corner outside her family's apartment, the same spot where Golden testified that she left Williams. Daniel Postlethwait testified that, after hearing gunshots, he observed a man with a ponytail being chased by another man and then escape in a burgundy Buick. In addition, testimony of police detectives revealed that Louia McDonald chased Williams until he entered a burgundy Buick identical to defendant's car. These witnesses' testimony provided corroboration of Golden's account of her and Williams' escape from the murder scene.

Furthermore, Golden's account of how she and defendant acquired a gun was corroborated by both LaKevin Norris and his mother, Olivia Norris. Detectives also testified that they recovered a gun from Olivia Norris and ballistics tests showed that the gun fired the bullet that killed Valerie McDonald. Other expert testimony further supported Golden's account. Golden's fingerprints were found inside defendant's car, while Eddie Williams' fingerprints were found on both the exterior and interior of defendant's car. Finally, both Williams' and defendant's fingerprints were found on a soda can recovered from the back seat of defendant's car.

Defendant argues that the testimony of her own witnesses and her alibi evidence greatly contradict the State's evidence. However, a careful review of defendant's extensive alibi evidence of the three days preceding the murder reveals that the only contradiction of Golden's account are the events of Sunday, June 21, 1987. Golden testified that she and defendant left Louia Jr. with defendant's sister and then twice traveled to Valerie McDonald's neighborhood. In contrast, several of defendant's family members testified that a large family gathering was held at defendant's house that entire day and defendant never left the premises. Nonetheless, the jury was entitled to credit the State's evidence and disregard defendant's alibi evidence, even though the alibi was supported by the greater number of witnesses. See 
People v. Jimerson
, 127 Ill. 2d 12, 46 (1989); 
People v. Berland
, 74 Ill. 2d 286, 307 (1978). Further, any infirmities in Golden's or the other witnesses' testimony go to the weight of the evidence and their credibility as witnesses. 
Young
, 128 Ill. 2d at 51.

In sum, given the totality of the evidence adduced at trial, and reviewing it in the light most favorable to the prosecution, we conclude that any rational trier of fact could have found defendant guilty beyond a reasonable doubt. We therefore reject defendant's claim that the State failed to prove her guilty beyond a reasonable doubt.

B. Inference That a Nontestifying Codefendant

Implicated Defendant

Defendant next contends that Detective Phillip Mannion's testimony that he arrested defendant immediately after interviewing codefendant Eddie Williams was erroneously admitted, violating her right of confrontation under the sixth amendment. Defendant's contention is that allowing Detective Mannion to testify that defendant's arrest came immediately after speaking with Williams, who did not testify at defendant's trial, led to the inescapable inference that Williams implicated defendant in the murder. We find defendant's contention without merit.

The portion of Detective Mannion's testimony that defendant highlights involved Mannion's description of the police investigation. On direct examination, Mannion testified that after defendant was first questioned regarding the murder she was allowed to go home while Golden remained in custody. Mannion further testified that after speaking with Golden on the night of June 24, 1987, he and several detectives accompanied Golden to the south side of the city, where Eddie Williams was apprehended. Then the prosecutor and Mannion had this exchange:

“Q. Did you talk to Eddy [
sic
] Williams?

A. Yes, I did.

Q. After you talked to Eddy [
sic
] Williams, did you go anywhere?

A. Yes.”

At this point defense counsel objected and, during a sidebar, moved for a mistrial, arguing that the testimony was an attempt to admit hearsay statements and provided an obvious inference that Williams had implicated defendant. The trial judge denied the motion, observing that there had been no mention of Williams' statement or that Williams implicated defendant. The trial judge allowed the trial to proceed and the prosecutor elicited testimony from Mannion that, after speaking to Williams, the police went to defendant's house and arrested her.

Detective Mannion at no time testified as to the substance of any statements Williams made to him. However, defendant argues that Mannion's testimony inferentially revealed that Williams had implicated her in the murder. This court has held that testimony recounting the course of a police investigation is admissible and does not violate the sixth amendment, even if a jury would conclude that the police began looking for a defendant as a result of what nontestifying witnesses told them, as long as the testimony does not gratuitously reveal the substance of the codefendants' statements. 
People v. Henderson
, 142 Ill. 2d 258, 304 (1990), citing 
People v. Johnson
, 116 Ill. 2d 13, 24 (1987). Detective Mannion's testimony simply related the course of the investigation; the fact that it may appear that something Williams said caused the police to arrest defendant does not mean that defendant has a right to cross-examine Williams. There was absolutely nothing to cross-examine Williams about given that the content of any statement he gave to the police was never disclosed at defendant's trial. 
Henderson
, 142 Ill. 2d at 304. Therefore, we reject defendant's contention.

C. Improper Closing Arguments

Defendant next contends that she was denied a fair trial because, during closing arguments, the prosecutor improperly used impeachment evidence as substantive proof that defendant was present with Golden when the murder weapon was obtained.

Olivia Norris testified on direct examination that when Golden came to her apartment on June 22, 1987, to retrieve the gun, Golden was accompanied only by a man she introduced as “Eddie.” Olivia testified that when Golden returned the next evening for the gun, Golden was accompanied by Eddie and another man Olivia did not know. During the cross-examination of Olivia, the following exchange occurred:

“Q. And isn't it a fact that Geraldine Smith was in your house the first day Marva came?

A. Was it the Thursday–first day–let me–

MR. SWANO [Defense Attorney]: Objection. If she knows, Judge.

MR. SHERWIN [Assistant State's Attorney]: Judge, he's trying to answer the question.

MR. SWANO: I'm not.

THE COURT: She may answer if she knows. What did you say?

A. I say let me think if it's the first or second.

Q. [Assistant State's Attorney:] When did you see Geraldine at your house with Marva?

MR. SWANO: Objection. Assuming facts not in evidence. She testified it was Eddie.

MR. SHERWIN: Judge, he doesn't like the answer.

MR. SWANO: She hasn't said an answer.

THE COURT: She said the first or second is what she said.

A. Let me see. Must have been the second. I think it was the second.

Q. [Assistant State's Attorney:] You saw Geraldine Smith at your house that week, didn't you? Didn't you?

A. Did I see Geraldine?

Q. Yes.

A. Yes, I did.

Q. And you talked to her, didn't you?

A. Yes, I did.”

Later during cross-examination, the prosecutor impeached Olivia with a statement she had made to police detectives on June 25, 1987, in which Olivia stated that defendant and Golden had been at Olivia's apartment together earlier in the week.

During the prosecutor's closing argument, the following occurred:

“MR. SHERWIN [Assistant State's Attorney]: And while LaKevin told you clearly that he saw Geraldine on that day that she came up there and was with Marva picking up the gun Olivia admitted it too, rather reluctantly I would say.

MR. SWANO [Defense Attorney]: Objection.

THE COURT: The jury heard the evidence.

MR. SHERWIN: Under cross-examination she finally admitted yes, Geraldine was there.

MR. SWANO: Objection.

THE COURT: Overruled. The jury heard the evidence.

MR. SHERWIN: That Geraldine, yes, she was there. That's two people that put Geraldine there with Marva. ***

* * *

MR. SHERWIN: Then they put [on] Olivia to show that Geraldine was not at her house. That was great. That exploded. It's kind of hard to believe what Olivia said on direct. Oh, Geraldine wasn't there. But on cross she sure admitted Geraldine was there.

MR. SWANO: Objection.

THE COURT: Overruled. The jury heard the evidence.”

Defendant contends that it was error to allow the prosecution to argue that Olivia admitted that defendant had accompanied Golden. Defendant argues that the only evidence showing that Olivia admitted defendant and Golden were at her home together was the prior statement Olivia made to police detectives, which the prosecution introduced only for impeachment purposes.

The prosecutor's statements were not error. The State has the right to comment on the evidence and draw all legitimate inferences deducible from the evidence, even if the inferences are unfavorable to defendant. 
People v. Johnson
, 149 Ill. 2d 118, 145 (1992). In addition, the State is allowed a great amount of latitude in making closing argument and, absent a clear abuse of discretion, the determination of the trial court as to the propriety of closing argument should be followed. 
Johnson
, 149 Ill. 2d at 145, citing 
People v. Brisbon
, 129 Ill. 2d 200, 223 (1989).

On cross-examination, the prosecutor asked Olivia the question, “When did you see Geraldine at your house 
with Marva
?” (Emphasis added.) Olivia replied: “Let me see. Must have been the second. I think it was the second.” Clearly Olivia answered that she had seen defendant together with Golden at her apartment. Moreover, defense counsel apparently interpreted Olivia's testimony in the same manner because during redirect examination he immediately attempted to rehabilitate Olivia by questioning her about her testimony in codefendant Eddie Williams' trial, in which she stated that she did not see defendant when Golden came to retrieve the gun. After carefully reviewing the record, we conclude that the prosecutor's remarks constituted a reasonable characterization of the evidence and logical inferences drawn therefrom. See 
People v. Peeples
, 155 Ill. 2d 422, 485-86 (1993); 
People v. West
, 137 Ill. 2d 558, 592 (1990).

D. Denial of New Trial Based on Newly Discovered Evidence

Defendant's next contention is that the trial court erred in failing to conduct an evidentiary hearing to investigate the allegations in her post-trial motion that the statements of nine new witnesses show that her conviction was based solely upon the perjured testimony of codefendant Marva Golden. Further, defendant argues that the testimony of these new witnesses would substantiate her theory that Golden acted alone in hiring Eddie Williams to kill Valerie McDonald. Defendant urges this court to grant her a new trial or, in the alternative, remand for a full evidentiary hearing to establish the materiality of the new witnesses' statements.

After their arrest, defendant and Golden were incarcerated at the Cook County jail. While defendant was subsequently released on bond, Golden remained in custody at the jail until she was transferred to a state penitentiary after testifying in defendant's case. Once defendant was convicted, she was returned to the jail. Shortly thereafter, defendant met nine women inmates who informed her of discussions they had previously had with Golden in which Golden claimed defendant was not involved in Valerie McDonald's murder.

Defendant filed a motion for a new trial, which was supported by affidavits and court-reported statements of these new witnesses. The trial court denied defendant's motion, finding that the newly discovered evidence merely sought to discredit the trial testimony of Golden and, thus, was cumulative of the trial testimony of Iris Harrison.

To warrant a new trial based on newly discovered evidence, the evidence: (1) must be of such conclusive character that it would likely change the result on retrial; (2) must be material to the issue but not merely cumulative; and (3) must have been discovered since the trial and be of such character that it could not have been discovered sooner through the exercise of due diligence. 
People v. Molstad
, 101 Ill. 2d 128, 134 (1984), quoting 
People v. Baker
, 16 Ill. 2d 364, 374 (1959). This court has held that a motion for a new trial predicated on newly discovered evidence is addressed to the discretion of the trial judge and denial of such a motion shall not be disturbed upon review absence a showing of an abuse of discretion. 
People v. Miller
, 79 Ill. 2d 454, 464 (1980), quoting 
Baker
, 16 Ill. 2d at 373-74. Moreover, the trial court can dispose of a motion for a new trial based upon newly discovered evidence without holding a full evidentiary hearing, as long as that decision is not an abuse of discretion. See 
People v. Kellick
, 102 Ill. 2d 162, 176-77 (1984).

 The State contends that the trial court correctly denied defendant's motion for a new trial. The State argues that the newly discovered evidence can, at best, be viewed as impeachment of a prosecution witness, which is an insufficient basis for granting a new trial. See 
People v. Holtzman
, 1 Ill. 2d 562, 568 (1953). Further, the State argues that the newly discovered evidence is merely cumulative of the trial testimony given by Iris Harrison and, thus, is insufficient to warrant a new trial. See 
Miller
, 79 Ill. 2d at 464-65.

This court, in 
People v. Holtzman
, 1 Ill. 2d 562, 568 (1953), determined:

“A distinction is to be drawn between evidence which impeaches a witness in the sense that it affects the credibility of the witness, and evidence which is probative in that it presents a state of facts which differs from that to which the witness testified. Newly discovered evidence, the effect of which is to discredit, contradict and impeach a witness, does not afford a basis for the granting of a new trial. If, however, it contradicts a witness by showing facts, a new trial may be ordered when it appears that such new evidence has sufficient probative force or weight to produce a result different from that obtained at the trial which has been had.”

A thorough analysis of defendant's proposed new evidence reveals that it does not contradict Golden by showing a set of facts different from her testimony. Initially, we note that the testimony of several of the new witnesses does not involve any claims that Golden 
falsely 
implicated defendant. Rather, these witnesses simply claim that Golden was angry with defendant and said she was going to testify against her. The testimony of the remaining new witnesses, at most, consists of descriptions of out-of-court statements made by Golden which had some inconsistencies with her trial testimony. Generally, a prior inconsistent statement of a witness is not admissible as substantive evidence but, rather, is admitted solely for its impeaching effect upon the credibility of the witness. 
People v. Cruz
, 162 Ill. 2d 314, 358-59 (1994); 
People v. Collins
, 49 Ill. 2d 179, 194 (1971). Defendant's new evidence could only have been admitted to discredit, contradict, and impeach Golden. Thus, the newly discovered evidence is insufficient to warrant a new trial. 
Miller
, 79 Ill. 2d at 464-65; 
Holtzman
, 1 Ill. 2d at 568; see also 
People v. Woodrome
, 237 Ill. App. 3d 220, 233-34 (1992) (new evidence of codefendant making out-of-court statement that defendant was not involved in crime held insufficient to warrant a new trial); 
People v. Wicks
, 15 Ill. App. 3d 318, 322 (1973) (new evidence attacking credibility of codefendant held insufficient to warrant a new trial even though testimony was only evidence of defendant's guilt).

Defendant argues that her case is strikingly similar to that of 
People v. Cotell
, 298 Ill. 207 (1921), in which this court granted a new trial after the defendant discovered new evidence attacking the credibility of an accomplice who testified against him. 
Cotell
, 298 Ill. at 217-18. Contrary to defendant's assertion, 
Cotell
 is readily distinguishable from the instant case. Although the new evidence in 
Cotell
 did impeach the testimony of the accomplice witness, it went further than impeachment. The accomplice testimony was the only evidence connecting the defendant to the crime. As this court observed, the new evidence presented facts which went to the very foundation of the State's case. 
Cotell
, 298 Ill. at 217. In contrast, in the instant case, the State presented substantial evidence of defendant's involvement in the murder besides Golden's testimony. Moreover, the record in the instant case reveals that the trial court expressly determined that, contrary to 
Cotell
, the testimony of the nine new witnesses added no new facts but, rather, merely attempted to impeach and discredit Golden. The trial court's decision was not an abuse of discretion.

We also cannot say that the trial court erred by determining that the new evidence was merely cumulative. A determination that newly discovered evidence is cumulative involves a finding that such evidence adds nothing to what is already before the jury (
Molstad
, 101 Ill. 2d at 135), and that, had the new evidence been introduced at trial, it would not have changed the result (
Ostendorf v. International Harvester Co.
, 89 Ill. 2d 273, 284 (1982)). In the instant case, the trial court could reasonably conclude that the new testimony of the nine inmates was merely cumulative to the trial testimony of Iris Harrison.

Harrison testified to a discussion she had in jail with Golden in which Golden described the murder of Valerie McDonald. Harrison testified that during this conversation, Golden stated that if she was going to go to prison then she was going to “take defendant with her.” Harrison also testified that Golden said defendant had nothing to do with the murder. Likewise, the basic premise of the testimony of the new witnesses was that Golden had made statements in jail prior to defendant's trial to the effect that, although defendant was not involved in the murder, Golden was nonetheless going to implicate defendant in her testimony. This theory of defense was extensively developed through cross-examination of Golden and the direct testimony of other witnesses. Further, defense counsel strenuously argued this theory during closing statements. Finally, the trial judge that denied defendant's motion for a new trial also presided at defendant's trial and heard Golden and Harrison testify, as well as all the other evidence. He could reasonably conclude that this newly discovered evidence added nothing to what was already before the jury.

Defendant argues that the newly discovered evidence is not merely cumulative because some of the testimony provides information regarding Golden's motive to falsely implicate defendant, which was not included in Harrison's testimony. Defendant cites the offered testimony of Ann Young, who heard Golden say she was going to “put” the murder on defendant so Golden would not get life in prison. Defendant's argument does not have merit. Evidence showing Golden had a bias, interest, or motive to testify falsely would be admissible only for purposes of impeaching Golden. See 
People v. Triplett
, 108 Ill. 2d 463, 475 (1985); 
People v. Norwood
, 54 Ill. 2d 253, 258-59 (1973) (promise of leniency made to prosecution witness admissible to impeach his or her credibility); see also M. Graham, Cleary & Graham's Handbook of Illinois Evidence §607.7, at 359-60 (5th ed. 1990). As we have already determined, newly discovered evidence offered to impeach a prosecution witness is an insufficient basis for granting a new trial. Moreover, defense counsel extensively cross-examined Golden about the plea agreement she had accepted in order to avoid the death penalty. Therefore, any new evidence which tended to show Golden's motive to testify falsely would also be cumulative.

Defendant also cites 
People v. Cihlar
, 111 Ill. 2d 212, 218 (1986), for the proposition that the significant number of new witnesses she offers should preclude a determination that the evidence is merely cumulative. However, 
Cihlar
 does not support defendant's argument. 
Cihlar
 involved newly discovered testimony of several witnesses which attacked the reliability of the victim's identification of the defendant as her assailant. Unlike the instant case, the victim's testimony in 
Cihlar
 was the only evidence connecting the defendant to the crime. In addition, the victim's testimony was completely uncontradicted at trial. 
Cihlar
, 111 Ill. 2d at 217-18. In contrast, defense counsel attempted to extensively contradict Golden's testimony. Thus, the 
Cihlar
 holding is not applicable to the instant case.

The new evidence defendant offered is substantially cumulative and affects only the credibility of Marva Golden, a matter that was already placed before the jury by the testimony of various witnesses and her cross-examination by defense counsel. As this court has previously stated:

“Applications for a new trial on the ground of newly discovered evidence are not looked upon with favor by the courts, and in order to prevent, so far as possible, fraud and imposition which defeated parties may be tempted to practice, as a last resort, to escape the consequence of an adverse verdict, such application should always be subjected to the closest scrutiny by the court, and the burden is upon the applicant to rebut the presumption that the verdict is correct and to show there has been no lack of diligence.” 
Holtzman
, 1 Ill. 2d at 569.

Judged by these standards, the trial court did not abuse its discretion in denying defendant's motion for a new trial.

II. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Defendant raises two issues regarding the effectiveness of her trial counsel. Her first contention is that she was deprived of the assistance of conflict-free counsel because William Swano, one of her trial attorneys, was involved in a variety of unethical and illegal practices during the period of his representation of defendant. Defendant reasons that the knowledge of an impending federal indictment on racketeering charges plagued Swano daily and, thus, prevented him from giving his full attention to her trial.

To support her contention, defendant supplements the record with the trial transcripts of Swano's testimony in the federal criminal trial of former Cook County Circuit Judge Thomas Maloney. Defendant highlights Swano's testimony, in which he admitted paying bribes to Judge Maloney in numerous criminal cases. Swano eventually became the subject of “Operation Greylord,” a federal criminal investigation into the fixing of cases in Cook County circuit court. Ultimately, Swano pled guilty to federal racketeering charges and agreed to cooperate with federal prosecutors in the case against Judge Maloney. Subsequently, Swano was suspended from the practice of law and later disbarred.

Defendant contends that the interests of justice require that she be granted a new trial. In support of this contention, defendant relies on the case of 
People v. Williams
, 93 Ill. 2d 309 (1982), in which this court ordered a new trial for a defendant whose trial counsel was disbarred following an ARDC investigation which overlapped with defendant's trial. Because of the uniqueness of the situation in 
Williams
, this court declined to apply the tests for ineffective assistance of counsel established in 
Strickland v. Washington
, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). This court stated that “considering the unique circumstances and sequence of events in this capital case, which will 
rarely, if ever, be duplicated
, that the interests of justice require that [the defendant] be granted a new trial.” (Emphasis added.) 
Williams
, 93 Ill. 2d at 325. Defendant argues that the “sordid circumstances” of her trial counsel far surpass those of the defense counsel in 
Williams
.

 We find defendant's argument without merit. In 
People v. Szabo
, 144 Ill. 2d 525, 529 (1991), this court limited the 
Williams
 decision, determining that it “was an aberration peculiar to the facts of that case.” The court also observed the factual differences between the two cases. Contrary to the extensive allegations of ineffectiveness asserted in 
Williams
, the defendant in 
Szabo
 only made brief and vague allegations of his counsel's deficient representation. In addition, defense counsel in 
Szabo
 did not appear before the ARDC until 10 months after the defendant's trial, while defense counsel in 
Williams
 was the subject of disbarment proceedings at the time of the defendant's trial. This court declined to apply a 
per se
 rule that a defendant be granted a new trial whenever his or her counsel is involved in proceedings with the ARDC. Rather, this court reviewed the defendant's claims under the 
Strickland
 ineffective assistance of counsel test. 
Szabo
, 144 Ill. 2d at 529-31.

 Subsequently, in 
People v. Franklin
, 167 Ill. 2d 1, 18 (1995), this court determined that the analysis of 
Williams
 and 
Szabo
 was applicable to an attorney who was being investigated for criminal infractions. In 
Franklin
, the defendant's attorney was targeted by the “Operation Greylord” investigation at the time of defendant's trial. This court observed that defense counsel was not indicted until after the conclusion of the defendant's trial and did not plead guilty to any charges until some time later. In addition, defense counsel did not appear in front of the ARDC until after the defendant's trial. This court noted that, at most, defense counsel was only under investigation for his involvement in “Operation Greylord” at the time of the defendant's trial and stated that “[b]eing under a criminal investigation is not of the same degree as appearing in front of the ARDC on current, pending complaints.” 
Franklin
, 167 Ill. 2d at 19. This court concluded that the defendant's claims regarding trial counsel must be reviewed under the 
Strickland
 ineffective assistance of counsel test. 
Franklin
, 167 Ill. 2d at 18-19.

We find that the “unique circumstances and sequence of events” existing in the 
Williams
 case are not present in the instant case. Swano first appeared in court for defendant on July 14, 1987. Defendant's trial ended on March 14, 1990. Swano's representation of defendant ended when she was sentenced on February 20, 1991. Defendant has provided evidence only that Swano was under investigation at the time of defendant's trial. Defendant concedes that Swano was not indicted until four months after his representation of defendant ended. This court has held that merely being the subject of a criminal investigation is not of the same degree as being the subject of current ARDC proceedings. 
Franklin
, 167 Ill. 2d at 19. In addition, Swano did not appear before the ARDC at the time of defendant's trial. Swano was not suspended from the practice of law until March 20, 1992, two years after defendant's trial. Moreover, Swano was not disbarred until January 23, 1996, nearly six years after the end of defendant's trial.

The circumstances of defendant's trial are also different from the circumstances of the trial in 
Williams
. Although both were trials of capital cases, in 
Williams
 the doubts about counsel's representation were accentuated by the burden of his simultaneous representation of three defendants before two juries. 
Williams
, 93 Ill. 2d at 325. In contrast, defendant in the instant case was the only person on trial and the only client Swano represented. Further, Swano was assisted by another attorney during defendant's trial. Additionally, in 
Williams
, the defendant offered “numerous instances of inaction by counsel to demonstrate” that the defendant was denied effective assistance of counsel. 
Williams
, 93 Ill. 2d at 324. In comparison, defendant in the instant case cites only one instance at trial, analyzed below, where she alleges that Swano's representation was deficient. The circumstances surrounding the investigation of Swano and the nature of defendant's trial do not meet the unique set of circumstances found to exist in 
Williams
. See 
Franklin
, 167 Ill. 2d at 19. Thus, defendant does not have a right to a new trial under the unique “interests of justice” standard applied in 
Williams
.

Furthermore, defendant's attempts to label this issue as a conflict of interest are unavailing. In 
People v. Titone
, 151 Ill. 2d 19 (1992), the defendant similarly contended that he was entitled to a new trial because his attorney suffered from an “avalanche” of personal problems during the time of the defendant's trials, including being a target of “Operation Greylord” investigation. This court held that the defendant's allegations of conflict of interest were really just an ineffective-assistance-of-counsel claim and, thus, must be analyzed under 
Strickland
. 
Titone
, 151 Ill. 2d at 31-32. Like 
Titone
 and 
Franklin
, defendant's claims in the instant case regarding her trial counsel must be analyzed in light of the 
Strickland
 tests for effectiveness of counsel.

Under 
Strickland
, defense counsel is ineffective only if: (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness; and (2) counsel's deficient performance prejudiced the defendant. 
Strickland
, 466 U.S. at 687-88, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064; 
People v. Albanese
, 104 Ill. 2d 504, 526 (1984). A strong presumption exists that defense counsel's performance falls within the “wide range of reasonable professional assistance” and, thus, is not deficient. 
Strickland
, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065.

The only alleged deficiency defendant raises regarding Swano's trial performance is that he failed to cross-examine LaKevin Norris about inducements the prosecution may have offered for his testimony. As detailed earlier, LaKevin testified in the instant case as a prosecution witness, while his mother, Olivia Norris, testified for the defense. The record reveals that during the State's case in chief, prosecutors informed the trial court that Olivia and her son, LaKevin, had failed to appear pursuant to a subpoena. As a result, a bench warrant was issued for Olivia's arrest. Shortly after the State rested its case, Olivia and LaKevin were located in Minneapolis and Olivia voluntarily returned to Chicago with LaKevin. The State was allowed to reopen its case so that LaKevin could testify.

After LaKevin's testimony, a conference was held regarding the disposition of the warrant against Olivia. The following exchange occurred:

“MR. SWANO [defense attorney]: I'm asking that she be ordered to return to court tomorrow or whenever her next court appearance is necessary in this case.

THE COURT: How do we know she'll return?

MR. SWANO: We don't. We'll keep her in custody?

THE COURT: That's right. We'll keep her in custody. We'll execute the warrant and keep her in custody.

MR. SWANO: That's fine.

THE COURT: Do you want her–

MR. SHERWIN [Assistant State's Attorney]: We promised LaKevin we wouldn't put her in jail.

MR. SWANO: Oh, you promised LaKevin you wouldn't put his mother in jail.

MR. SHERWIN: You want to put her in jail?

MR. SWANO: No.

MR. SHERWIN: Then make it–on the record you did.

MR. SWANO: That's some sort of inducement to Kevin [
sic
] that we didn't know about.

MR. SHERWIN: Said it was up to the judge.

MR. SWANO: That's not exactly what Mr. Sherwin said.

THE COURT: Are you asking that she be taken in custody or do you want to keep it–

MR. SHERWIN: We'll leave it at your discretion, Judge.”

Subsequently, the trial court ordered that Olivia be taken into custody. Defense counsel did not ask for LaKevin to be recalled so that he could cross-examine LaKevin about any inducement the State had offered for his testimony.

Defendant contends that if LaKevin testified for the State in exchange for a promise that his mother would not be arrested, then such a fact would provide substantial impeachment of LaKevin's credibility. Nevertheless, defendant's claim of deficient cross-examination of LaKevin is meritless. Generally, the decision whether or not to cross-examine or impeach a witness is a matter of trial strategy which cannot support a claim of ineffective assistance of counsel. 
People v. Pecoraro
, 175 Ill. 2d 294, 326 (1997); 
Franklin
, 167 Ill. 2d at 22.

Defense counsel could have reasonably determined that it would be ineffective to question LaKevin regarding the prosecutor's inducement not to jail his mother. After reviewing the exchange quoted above, it is not conclusive as to whether the State actually made such a promise, given the prosecutor's explanation that he “said it was up to the judge.” Defense counsel could have reasonably decided that the jury would not believe that the State had made any promises to LaKevin since his mother was jailed anyway. In addition, defense counsel extensively cross-examined LaKevin on a number of matters, including his prior inconsistent statements, his inability to accurately recall the events, and the fact that he previously met with prosecutors and discussed his testimony.

Defendant's sole complaint regarding her counsel's trial performance is directed at trial strategy. This court has repeatedly held that an ineffective-assistance-of-counsel claim which arises from a matter of defense strategy will not support a finding of ineffective representation. 
Franklin
, 167 Ill. 2d at 22; 
Szabo
, 144 Ill. 2d at 531; 
People v. Flores
, 128 Ill. 2d 66, 81-82 (1989). Notwithstanding defendant's argument that cross-examination of LaKevin might have been treated differently, we cannot say that trial counsel's approach fell outside the wide range of reasonable professional assistance and, thus, defendant's trial counsel was not deficient.

III. SENTENCING ISSUES

Defendant raises five issues concerning her sentencing proceedings and two challenges to the constitutionality of the Illinois death penalty statute. Defendant argues that: (1) her waiver of the right to a jury for capital sentencing was constitutionally invalid under the sixth, eighth, and fourteenth amendments because she was advised that the jurors had to be unanimous in a decision not to impose death; (2) she was deprived of conflict-free counsel because her attorney also represented a State's witness during the capital sentencing proceedings; (3) she was denied effective assistance of counsel because her attorney failed to investigate and present mitigating evidence concerning her behavior after incarceration; (4) her death sentence is excessive given the substantial mitigation evidence presented and lack of aggravation evidence; and (5) her death sentence is unreasonably disparate from the natural life term of imprisonment imposed on codefendant Eddie Williams. Regarding the constitutionality of the Illinois death penalty statute, defendant argues that the statute: (1) places a burden of proof on a defendant which precludes meaningful consideration of mitigation; and (2) does not sufficiently minimize the risk of arbitrarily imposed death sentences. We first address defendant's arguments regarding the excessiveness of her death sentence.

In order to prove its factors in aggravation during the second phase of the sentencing proceedings, the State relied on the evidence adduced at trial, as well as the additional testimony of four witnesses. Mary Cross testified that during the summer of 1986 she was with Valerie McDonald in a department store when they encountered Louia and defendant together. Then in early September 1986, Cross was at the McDonalds' home when Valerie received a telephone call. Valerie instructed Cross to listen in on the call, so Cross picked up an extension. Cross testified that she recognized the caller's voice as defendant's and heard defendant tell Valerie that she was not going to win and might as well give up.

Officer Robert Clark again testified to the altercation between defendant and Valerie McDonald which occurred on July 4, 1986. Clark testified that after he recovered the handgun from under the front seat of Louia McDonald's car, he showed it to Louia, who denied that it belonged to him. Clark testified that Louia then claimed that defendant had carried a gun in the past. Clark also testified that Valerie claimed defendant previously threatened her with a gun.

Detective Raymond Kamenski testified that on June 25, 1987, he spoke with defendant and she denied knowing Eddie Williams. Shortly thereafter, Kamenski told defendant that fingerprints were recovered from her car and, after learning this information, defendant admitted knowing Williams and stated that he may have been in her car.

Detective Phillip Mannion testified that he arrested Louia McDonald on March 17, 1990, for obstruction of justice for absenting himself and Lakeya during defendant's trial. The State introduced a statement Louia gave to Mannion that day, which had been reduced to writing and signed by Louia. In the statement, Louia asserted that defendant told him that she did not want either Louia or Lakeya to testify at her trial because it would hurt her case. Louia also claimed in the statement that defendant called him at work on February 28, 1990, and informed him that the police had a warrant for his arrest. That night, Louia met with defendant and three of her sisters. The four women persuaded Louia to take Lakeya out of school and “hide out.” Louia and Lakeya then went to defendant's sister's home that night and stayed until March 15, 1990, the day after defendant was convicted. Lakeya returned to school the next day. The parties stipulated that school records would show that Lakeya was absent from March 1, 1990, through March 15, 1990. In addition, records from Louia's work place would demonstrate that he missed work from March 2, 1990, through March 9, 1990.

Defendant then presented the testimony of four mitigation witnesses. Among the witnesses were defendant's older sister and former brother-in-law, who both testified about defendant's family life. Defendant is the next to youngest of 10 living siblings and a native of Belzoni, Mississippi. Defendant moved to Chicago in 1967 to make a better life for herself and to be closer to most of her siblings. Defendant has four children, including a son, Roydric, who was born with cerebral palsy. Defendant brought Roydric home for the first year after his birth but, because of his need for constant care, eventually had to have him permanently hospitalized. Before her incarceration, defendant maintained as much contact with Roydric as possible, given that he was living in a distant care center. These witnesses also testified that defendant was a caring and loving person whom they had never known to be violent or commit illegal acts.

Another mitigation witness was Reverend James R. Goodwin, a local pastor who serves as a volunteer chaplain at the women's division of the Cook County jail. Goodwin testified that he became acquainted with defendant through this ministry and that he saw nothing in defendant that would suggest she was a violent person. Goodwin also testified that defendant leads Bible classes for her fellow inmates and also corresponds with members of his congregation.

In addition to the live testimony, the trial court took judicial notice of the testimony of the character witnesses defendant presented at trial. This testimony consisted of defendant's former employer and several fellow church members, who all testified to defendant's reputation for peacefulness and honesty. In addition, the trial court ordered a presentencing investigation report which revealed, among other things, that defendant had no prior criminal record.

Closing arguments were held and defendant spoke in allocution. Subsequently, the trial court sentenced defendant to death, observing that a lesser sentence would denigrate the seriousness of the offense. Defendant filed a motion to vacate her death sentence, which was supported by numerous affidavits and letters from defendant's friends and neighbors as well as clergy members. The trial court denied defendant's motion.

Defendant contends that the sentence of death is excessive given the substantial evidence in mitigation she presented. Although she acknowledges the seriousness of this crime, defendant argues that her otherwise exemplary character and lack of criminal record outweigh the aggravating evidence and she urges this court to vacate her death sentence and remand for the imposition of a sentence other than death.

In support of her contention, defendant notes that at the time of the shooting she had no criminal record at all and no history of violence. The lack of a significant criminal history is a statutory mitigating factor. Ill. Rev. Stat. 1987, ch. 38, par. 9–1(c)(1). Defendant also argues that she led an exemplary life for 39 years prior to this offense, serving as an upstanding member of her community and church. Defendant observes that she was steadily employed her entire adult life and also worked her way through college. Defendant notes that she is the single mother of four children, including one who has been hospitalized most of his life.

The State contends that defendant's death sentence is not excessive. The State points out that defendant was eligible to receive the death penalty because she procured another to commit murder, a statutory aggravating factor. See Ill. Rev. Stat. 1987, ch. 38, par. 9–1(b)(5). The State argues that it is clearly the legislative intent to impose the most severe sanction for this type of offense. The State also contends that defendant's case contains no special circumstances, such as an extreme emotional disturbance, which would justify vacating her death sentence. Rather, the State argues that the fact that defendant and her accomplices planned and acted out the murder plot over a three-day period demonstrates that the crime was not a spontaneous, passionate reaction to a triggering event.

This court will generally not interfere with a trial court's determination of sentence unless the trial court has abused its discretion. See, 
e.g
., 
People v. Blackwell
, 171 Ill. 2d 338, 360 (1996); 
People v. Gonzalez
, 151 Ill. 2d 79, 89 (1992). Nevertheless, this court has previously vacated death sentences where such an extreme penalty was found to be inappropriate, in light of any relevant mitigating factors. 
Blackwell
, 171 Ill. 2d at 364; 
People v. Leger
, 149 Ill. 2d 355, 408 (1992); 
People v. Johnson
, 128 Ill. 2d 253, 282 (1989); 
People v. Buggs
, 112 Ill. 2d 284, 295 (1986); 
People v. Carlson
, 79 Ill. 2d 564, 590 (1980). In determining whether a death sentence was properly imposed, this court considers “the character and record of the individual offender or the circumstances of the particular offense.” 
Woodson v. North Carolina
, 428 U.S. 280, 304, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991 (1976) (plurality opinion). This court is also guided by the recognition that “each capital case is unique and must be evaluated on its own facts, focusing on whether the circumstances of the crime and the character of the defendant are such that the deterrent and retributive functions of the ultimate sanction will be served by imposing the death penalty.” 
Johnson
, 128 Ill. 2d at 280. Therefore, we give less deference to the trial court on this issue than we would in other sentencing matters. 
Blackwell
, 171 Ill. 2d at 361.

An analysis of previous cases where this court has found a death sentence to be excessive is useful. In 
People v. Carlson
, 79 Ill. 2d 564 (1980), the defendant was convicted of the murders of his ex-wife and a police officer. The defendant and his ex-wife had planned to remarry, but his ex-wife postponed the wedding because she had a new boyfriend. Soon after learning this news, the defendant purchased a gun and ammunition, loaded the gun, and placed it in his car. The next day, the defendant twice drove by his ex-wife's house and “got mad” when he saw a strange car in the drive way, assuming she was entertaining the man. The defendant then purchased two gasoline cans, filled them with gasoline, and stored them in the trunk of his car. The next day, the defendant went to his ex-wife's house and shot her 10 times. The defendant then poured gasoline throughout the house and set it on fire. When police later tried to arrest the defendant, he shot and killed one of the officers. In vacating the defendant's death sentence, this court emphasized that the defendant had no prior criminal record, that the crimes were an isolated incident, and that the defendant had suffered severe emotional and physical problems before the shootings.

In 
People v. Buggs
, 112 Ill. 2d 284 (1986), the defendant was convicted of the murders of his wife and one of their children. The defendant and his wife were in their bedroom arguing about his wife's infidelity. During the argument, the defendant's wife told him that he was not the father of two of their children. At that point, the defendant became enraged and took a gasoline can he had earlier stored in the bedroom and poured gasoline on his wife. The defendant then splashed gasoline down the stairs and set fire to the house. The defendant's wife and one of their children died in the fire. In reducing the defendant's death sentence, this court noted that the defendant had a history of marital problems, had no history of serious criminal activity, and that this event was an isolated incident.

Finally, in 
People v. Leger
, 149 Ill. 2d 355 (1992), the defendant murdered both his estranged wife and ex-wife. Five days before their divorce was to be final, the defendant shot and killed his estranged wife. Later that same evening, the defendant drove to a neighboring county and broke into his ex-wife's home. The defendant then shot his ex-wife and her new husband each several times, killing his ex-wife and wounding her husband. In reducing the defendant's sentence to a term of natural life imprisonment, this court noted that the defendant, among other things, had a history of marital and emotional problems and, other than two battery convictions related to his marital discord, had no history of serious criminal activity.

We find that the mitigating factors emphasized in the cases cited to be comparable to those present in the instant case. Defendant presented substantial mitigating evidence at sentencing. Like the cases discussed above, defendant had no criminal record. Prior to this offense, the only encounter defendant ever had with the police stemmed from the emotional problems resulting from her relationship with Louia. Further, the testimony at trial and sentencing showed that defendant's previous marital relationship was not disruptive, defendant was not abusive to her children and had no history of prior violence.

The record contains other relevant mitigation evidence. Prior to trial, dozens of defendant's friends and family members wrote letters to the trial court requesting a reduction in defendant's bond. In addition, the record contains 21 letters and affidavits which were written in support of defendant's motion to vacate her death sentence. All of these documents describe defendant as a loving, caring, generous individual who is a good mother and hard worker. Moreover, several members of the clergy, who know defendant through their ministries at either the Cook County jail or the penitentiary, stated that defendant served as a positive role model for other inmates by teaching Bible classes and encouraging them to improve themselves. One minister who had counseled defendant stated that defendant has shown great remorse for what she has done.

The State is correct that defendant was eligible for the death penalty because she hired another to commit murder. Nevertheless, the legislature did not intend that every defendant who qualifies for the death penalty receive the death sentence. 
Blackwell
, 171 Ill. 2d at 364, citing 
Johnson
, 128 Ill. 2d at 277. Rather than focus on the fact that this offense was a “contract killing,” we are compelled to focus on the individual offender and the circumstances of the particular offense (
Johnson
, 128 Ill. 2d at 280). Doing so, we see an individual with no past criminal record who would in all probability be leading a life acceptable to our society had not her unfortunate affair triggered this tragic sequence of events. See 
Carlson
, 79 Ill. 2d at 590. Where a defendant has been convicted for a murder which seems to be an aberration brought on by special circumstances, which in all likelihood will not be repeated, neither the deterrent nor the retributive functions of the death penalty are served. 
Johnson
, 128 Ill. 2d at 278.

There is no question that this was an abhorrent crime. Valerie McDonald was the innocent victim of a brutal and violent attack which occurred in the presence of her minor children and was the culmination of her husband's extramarital affair. Defendant unfortunately became involved in a romantic relationship with a married man and became pregnant as a result of the affair. Subsequently, the man broke his promise to defendant that he would leave his wife for her. Defendant sadly blamed Valerie as the source of all her problems. While defendant's jealousy and rage are no excuse for her horrendous actions, we nevertheless agree that she “has led a relatively blameless life except for this one explosive episode” and the retributive and deterrent functions of the death penalty will not be served by putting her alone to death for this offense. 
Johnson
, 128 Ill. 2d at 282; 
People v. Gleckler
, 82 Ill. 2d 145, 171 (1980). Therefore, we hold that the penalty of death should not be imposed upon defendant and, accordingly, vacate her death sentence.

In a related issue, defendant contends that her sentence of death is unreasonably disparate from the natural life sentence received by codefendant Williams, who was convicted of murder, conspiracy to commit murder and armed violence for his participation as the shooter in this offense. As evidence of disparate sentencing, defendant points out that Williams' prior record, which includes convictions for voluntary manslaughter, felony theft, burglary, and criminal trespass to a vehicle, is much more extensive than that of defendant. Moreover, defendant argues she has a much greater potential for rehabilitation than Williams, who, in return for $400, murdered Valerie McDonald less than four months after his release from prison after serving a sentence for a voluntary manslaughter conviction. Finally, defendant argues that she is no more culpable than Williams, who actually shot and killed Valerie McDonald.

Defendant maintains that her disparate sentence violates the constitutional prohibition against the arbitrary and capricious imposition of the death penalty. Because we have already determined that defendant's death sentence is excessive, we need not address this issue. Nevertheless, we recognize that there likely would not have been a murder if defendant had not paid Golden and Williams $500. However, we also observe that defendant would probably not have acted on her jealous rage towards Valerie if defendant had not been associated with such ready and able accomplices. Golden readily volunteered to help defendant and then took her directly to a place where Golden knew they could hire a killer. Golden then approached Williams and negotiated the deal, keeping a commission for herself. When he was propositioned by Golden, Williams did not hesitate before agreeing to kill an unknown woman for a mere $400, notwithstanding the fact that he had just completed a prison term for killing another person. After securing Williams, Golden then proceeded to her cousin's home, where she knew they could quickly obtain a murder weapon.

Further, Williams and Golden both had several opportunities to abandon the conspiracy and prevent the death of Valerie McDonald. When the two failed to find the victim the first night, they returned the gun to its owner. Although they could have withdrawn from the scheme at that point, they nevertheless returned dutifully to work the next night to complete the odious deed. Williams had the final opportunity to preserve Valerie's life when he saw her arrive home with her family, yet instead he chose to shoot her in the presence of her young children. While we do not minimize the role that defendant played in this offense, we recognize that she had no prior criminal history and her rehabilitative prospects are not demonstrably poorer than her codefendants who received terms of imprisonment. See 
Gleckler
, 82 Ill. 2d at 171.

Defendant raises a number of other issues regarding her sentencing hearing and the constitutionality of the death penalty statute. However, because we find the death penalty to be inappropriate in this case, we need not address these arguments.

CONCLUSION

For the reasons set forth herein, the convictions are affirmed. The death sentence is vacated. The cause is remanded to the circuit court of Cook County with directions to impose a sentence other than death.

Convictions affirmed;

death sentence vacated;

cause remanded with directions.

CHIEF JUSTICE FREEMAN, specially concurring:

Although I join in Justice McMorrow's separate opinion, I write briefly to address a point raised in the dissent. The dissenting justices note that the present case is distinguishable from the cases relied upon by the majority because those cases involved defendants who were acting in response to what this court considered “mental or emotional disturbances or abnormally stressful circumstances.” Slip op. at 47 (Miller, J., concurring in part and dissenting in part, joined by Heiple and Bilandic, JJ.) To the extent that this statement can be viewed as standing for the proposition that without such a “triggering” event, any argument regarding excessiveness must fail, I disagree. In the past, this court has recognized that each capital case is unique and, therefore, must be evaluated on its own facts in order to determine the appropriateness of the death sentence. See 
People v. Johnson
, 128 Ill. 2d 253, 280 (1989). Our ability to reverse a sentence of death on the basis of excessiveness is not restricted to only those cases containing explosive or otherwise sudden mental or psychological episodes. In my view, the 
Johnson-Carlson-Buggs
 line of cases does not stand for the proposition that this court will vacate a sentence of death whenever a defendant can demonstrate the existence of two mitigating factors, 
i.e.
, the lack of a significant history of prior criminal conduct 
combined
 with a sudden, explosive episode of violence, resulting from extreme mental or emotional disturbance. More important, I do not read these cases to command affirmance of the death sentence in the absence of either or both of these factors of mitigation. Rather, this court must remain cognizant of the fact that the unique nature of capital cases requires “consideration of the character and record of the individual offender and the circumstances of the particular offense.” 
People v. Pasch
, 152 Ill. 2d 133, 201 (1992), quoting 
Woodson v. North Carolina
, 428 U.S. 280, 304, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991 (1976). Consequently, this court is duty-bound to reverse a capital sentence on this basis whenever the record demonstrates that the imposition of the sentence would not serve the deterrent and retributive purposes of capital sentencing. See 
People v. Tye
, 141 Ill. 2d 1, 30 (1990), citing 
Gregg v. Georgia
, 428 U.S. 153, 183, 49 L. Ed. 2d 859, 880, 96 S. Ct. 2909, 2929-30 (1976) (plurality opinion). Contrary to the implication raised by the dissent, 
Carlson
 and its progeny represent “nothing more, and nothing less, than a recognition of this court's responsibility in every death penalty case to carefully consider the character of the defendant and the circumstances of his crime before we sanction the termination of his life.” 
Tye
, 141 Ill. 2d at 37 (Ryan, J., concurring in part and dissenting in part, joined by Clark and Calvo, JJ.).

JUSTICE McMORROW joins in this special concurrence.

JUSTICE McMORROW, also specially concurring:

I write separately because I do not agree that the defendant's death sentence should be vacated for the reasons stated in the majority opinion. I agree with Justice Miller's partial dissenting opinion to the extent that it rejects the majority's characterization of the defendant's actions in this case as an “explosive episode.” Nonetheless, I concur with the majority's disposition insofar as it affirms the defendant's conviction and vacates the death penalty because under the facts of this case I believe that the defendant's death sentence is unreasonably disparate to the natural life sentence imposed on her codefendant, Eddie Williams.

The majority opinion states that although jealousy and rage are no excuse for murder, the defendant lead a relatively blameless life except for this one “explosive episode.” The majority then concludes that this case is analogous to a line of cases in which this court has vacated the death penalty where the defendant acted impulsively in response to mental or emotional disturbances or abnormally stressful circumstances. 
People v. Blackwell
, 171 Ill. 2d 338 (1996); 
People v. Leger
, 149 Ill. 2d 355 (1992); 
People v. Johnson
, 128 Ill. 2d 253 (1989); 
People v. Buggs
, 112 Ill. 2d 284 (1986); 
People v. Gleckler
, 82 Ill. 2d 145 (1980); 
People v. Carlson
, 79 Ill. 2d 564 (1980). Because I find that these cases are distinguishable from the facts and circumstances of the present case, I do not agree that they serve as the proper justification for vacating the trial court's decision to sentence the defendant to death. I agree with the dissenting opinion's statement that the murder in this case was the culmination of an escalating history of the defendant's aggression and hostility toward the victim. I further agree that the defendant's actions were not an immediate response to a stressful event. Rather, the defendant, over a lengthy period of time, planned to take the victim's life in order to fulfill her own desire to continue an extramarital affair with the victim's husband.

Despite my disagreement with the majority's rationale, I nonetheless concur in the judgment, based on my analysis of a related issue raised by the defendant in her supplemental brief, 
i.e.
, whether the defendant's death sentence is unreasonably disparate to the life sentence imposed on her codefendant, Eddie Williams. In my view, this is the pivotal sentencing issue raised on appeal. Although the majority acknowledges the issue and offers some analysis, it declines to answer the question. Thus, I offer my reasons for concurring in the disposition reached in this case.

Following a jury trial, codefendant Williams was convicted of the first degree murder of Valerie McDonald, conspiracy to commit murder and armed violence. The jury determined beyond a reasonable doubt that Williams fired the shot which resulted in the victim's death. Following a separate hearing, the jury found Williams eligible for the death penalty and found no mitigating circumstances sufficient to preclude its imposition. Accordingly, the trial court sentenced Williams to death. On appeal to this court, we vacated Williams' death sentence and remanded the cause for a new sentencing hearing based upon the cumulative errors which occurred during the sentencing phase of Williams' trial. 
People v. Williams
, 161 Ill. 2d 1 (1994). Following a new sentencing hearing in 1995, a jury found Williams death eligible. However, the jury was unable to reach a unanimous decision with respect to whether there existed mitigating factors sufficient to preclude a death sentence. Therefore, the trial court sentenced Williams to a term of natural life in prison without parole.

On appeal in the present case, the defendant maintains that Williams' culpability for the murder of Valerie McDonald was “measurably greater” than her culpability. See 
People v. St. Pierre
, 146 Ill. 2d 494, 514 (1992) (death sentence upheld because the culpability of the defendant who delivered the fatal blows was “measurably greater” than that of the individuals who conceived the plan to murder); 
People v. Ashford
, 121 Ill. 2d 55 (1988) (death sentence upheld where defendant was the triggerman, firing nearly all of the fatal shots which killed four victims). In the alternative, she argues that she and Williams were equally culpable. Notably, the State, in its supplemental brief, repeatedly concedes that defendant Smith was no more culpable than codefendant Williams. The defendant contends that because Williams' character and background are more contemptible, his criminal record more extensive and his prospects for rehabilitation significantly poorer than the defendant's, Williams' life sentence for the murder of Valerie McDonald renders her death sentence unconstitutional (U.S. Const., amend. VIII; Ill. Const. 1970, art. I, §11).

In sentencing the defendant to death, the trial court in this case characterized the defendant's actions in orchestrating the murder as cold and callous. The court also found that the defendant acted with a malignant heart, and that she served as the moving force behind the victim's murder. However, the trial court in the case at bar did not have the opportunity to consider Williams' lesser sentence because Williams' sentence was reduced to life imprisonment 
after
 the death penalty had been imposed on defendant Smith.

This court gives great deference to the trial court in sentencing matters (
Ashford
, 121 Ill. 2d at 88). Deference to a trial court's sentencing judgment is not warranted “where an arbitrary and unreasonable sentencing disparity exists between equally culpable codefendants” (
Ashford
, 121 Ill. 2d at 88). In 
People v. Page
, 156 Ill. 2d 258 (1993), we considered the issue of whether the defendant's death sentence should be vacated because his sentencing jury was precluded from hearing nonstatutory mitigation evidence that his codefendant had pled guilty and was sentenced to life imprisonment. We held that evidence of a codefendant's lesser sentence is not a relevant mitigating factor for consideration at the “trial level” in a death penalty case because the safeguard to prevent unjustified disparity between equally culpable defendants exists at the “appellate level.” 
Page
, 156 Ill. 2d at 272. Therefore, I believe it is appropriate to address the disparity between the defendant's and Williams' sentences at this juncture.

Comparative proportionality review in death penalty cases is not required by the United States Constitution (
Pulley v. Harris
, 465 U.S. 37, 79 L. Ed. 2d 29, 104 S. Ct. 871 (1984)) and it is not a feature of the capital sentencing process under the Illinois Constitution (
People v. Jimerson
, 127 Ill. 2d 12 (1989)). However, the defendant is not asking this court to compare her case to other unrelated cases with similar facts. Rather, she requests that this court compare her death sentence with the life sentence imposed on her accomplice.

This court previously has considered the issue of whether a sentence of death is disproportionately harsh in comparison with a less severe sanction imposed upon a codefendant convicted of the same crime. See 
People v. Towns
, 174 Ill. 2d 453 (1996); 
People v. Byron
, 164 Ill. 2d 279 (1995); 
People v. Burt
, 168 Ill. 2d 49 (1995); 
People v. Thompkins
, 161 Ill. 2d 148 (1994); 
St. Pierre
, 146 Ill. 2d 494; 
People v. Flores
, 153 Ill. 2d 264 (1992); 
Ashford
, 121 Ill. 2d 55; 
People v. Gleckler
, 82 Ill. 2d 145 (1980). This court has consistently recognized that it has a duty to prevent arbitrary and capriciously imposed death sentences (
Burt
, 168 Ill. 2d at 80; 
People v. Bean
, 137 Ill. 2d 65 (1990); 
Gleckler
, 82 Ill. 2d 145), and a duty to ensure that cases in which a death sentence is imposed are rationally distinguished from those in which a death sentence is not imposed (
St. Pierre
, 146 Ill. 2d at 513). Judicial review of codefendants' sentences in a capital case is appropriate in order to avoid a disparate imposition of the death penalty. 
Page
, 156 Ill. 2d at 270-71.

In reviewing whether a death sentence is proper or arbitrary, prior decisions of this court have focused on the nature of the offense and each individual's relative involvement or culpability, the defendant's character and background, including criminal records, and the defendant's potential for rehabilitation. 
Burt
, 168 Ill. 2d at 80;
 Flores
, 153 Ill. 2d at 294. Similarly situated individuals should not be given arbitrary or unreasonably disparate sentences. 
Burt
, 168 Ill. 2d at 80.

The State argues that the record in the case at bar indicates that defendant is “as culpable” as Williams and that defendant's culpability is “just as great” as Williams' culpability. The State does not argue that defendant is more culpable than Williams. If she were more culpable, then she would be more deserving of the death penalty, but, again, the State does not and cannot argue that defendant was more culpable than Williams. As the majority opinion recognizes, Williams served as a ready and willing accomplice to the victim's murder. He had several opportunities to abandon the conspiracy and prevent the victim's death. It was Williams who had the final opportunity to spare the victim's life, but instead chose to fire the fatal shot. See, 
e.g
., 
Byron
, 164 Ill. 2d at 303.

Comparing the character and background of defendant and Williams does not provide a sufficient basis for the sentence disparity. I find no evidence that defendant had ever been arrested prior to her arrest in connection with this murder. The defendant has no prior criminal convictions. The record contains numerous letters from individuals who recounted the defendant's positive life accomplishments prior to her involvement in this crime. In contrast, Williams' criminal background is extensive and serious. At the time that Williams murdered the victim in the present case, he was on probation for voluntary manslaughter and had been released from prison just a few months earlier. The voluntary manslaughter conviction stemmed from an incident in which Williams and another individual beat and strangled a man to death in his bed. Williams also had convictions for felony theft and burglary, retail theft and criminal trespass to a vehicle. Other testimony in the record shows that in 1978 Williams beat a woman named Bridget Williams. In 1979, he stole a woman's purse; and in 1981, Williams threatened to shoot a man with a loaded revolver.

The record further shows that the defendant has greater rehabilitative potential than her codefendant. Several prison chaplains testified or submitted affidavits stating that the defendant's attitude and behavior during her incarceration show that she has the capacity to be a productive member of prison society. The chaplains attested to the defendant's leadership skills and her positive influence on the other inmates. The defendant was described as a cooperative prisoner who is concerned for others.

In contrast, Williams' rehabilitative prospects appear to be poor. While imprisoned for voluntary manslaughter from 1982 to 1987, Williams received approximately 25 disciplinary tickets for various offenses, including threatening correctional officers. A clinical psychologist testified that Williams suffers from two personality disorders, including an antisocial personality. Most notably, Williams committed the murder in the case at bar after being released from prison only a few months earlier and while he was on probation for voluntary manslaughter.

It is the duty of this court to vacate a death sentence where an unreasonable disparity exists between equally culpable codefendants. 
Ashford
, 121 Ill. 2d at 88. The overriding principle in death penalty cases is that each case is unique and sentences must be evaluated on their individual facts. 
Johnson
, 128 Ill. 2d at 280. In my opinion, the facts of this case indicate that the defendant's culpability is no greater than that of her codefendant, and, after comparing their character and background, criminal history and potential for rehabilitation, I find that the evidence shown in the record does not reasonably support the disparate sentences imposed on the defendant and Williams. 
Cf
. 
People v. Jackson
, 145 Ill. 2d 43, 124-25 (1991). This is 
not
 to say that a defendant who initiates a murder-for-hire plan cannot receive the death penalty where a codefendant who fires the fatal shot receives a lesser sentence. Rather, I believe that in the facts of the present case there is no rational basis on which to affirm the death sentence received by the defendant when her death sentence is compared to the life sentence imposed on Williams. Therefore, I conclude and would hold that the defendant's death sentence should be vacated and she, like Williams, should be sentenced to life imprisonment. For the reasons stated, I concur only in the judgment of the majority opinion.

CHIEF JUSTICE FREEMAN joins in this special concurrence.

JUSTICE MILLER, concurring in part and dissenting in part:

I concur in that part of the majority opinion that affirms the defendant's convictions. I do not agree, however, with the majority's conclusion that death is an excessive sentence in this case. In my view, the death penalty is appropriate punishment here, and I would therefore consider in this appeal the remaining sentencing issues raised by the defendant.

The record in this case provides ample support for the trial judge's decision to sentence the defendant to death. The victim was shot outside her home as she and her family were returning from church one evening, and the victim died as a result of her injuries two days later. The victim was married to the father of the defendant's child, and the defendant had paid a codefendant to kill the wife. By hiring another person to commit the murder, the defendant was eligible for the death penalty under section 9–1(b)(5) of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, par. 9–1(b)(5)).

The defendant argues, and the majority agrees, that the present case is similar to other cases in which this court has vacated death sentences as excessive. See 
People v. Blackwell
, 171 Ill. 2d 338 (1996); 
People v. Leger
, 149 Ill. 2d 355 (1992); 
People v. Johnson
, 128 Ill. 2d 253 (1989); 
People v. Buggs
, 112 Ill. 2d 284 (1986); 
People v. Gleckler
, 82 Ill. 2d 145 (1980); 
People v. Carlson
, 79 Ill. 2d 564 (1980). Notably absent from the present case, however, are the mitigating circumstances this court has considered important in earlier decisions in determining that death is an inappropriate punishment. In general terms, cases in which this court has previously vacated death sentences as excessive have involved defendants who were acting in response to what the court in those cases found to be mental or emotional disturbances or abnormally stressful circumstances. Many of those cases have also involved defendants who had led blameless lives and had little, if any, prior contact with the police. See 
People v. Tye
, 141 Ill. 2d 1, 30 (1990).

The present case is much different from the pattern of our previous decisions in which the death penalty has been found to be an excessive sanction. What distinguishes this case from the others is the history of the defendant's antagonism toward the victim and the amount of careful planning done by the defendant in preparation for the offense. First, the victim's murder was the culmination of a lengthy and escalating history of aggression by the defendant against the victim. A year before the murder, the defendant had gone to the victim's residence while armed with both a gun and a hammer. At that time, the defendant and the victim became involved in a fight, which was broken up by a police officer. The victim told the officer that the defendant had previously threatened her with a gun. On a later occasion, the defendant made a threatening telephone call to the victim.

In addition, the murder committed in the present case was not the defendant's own immediate response to a particularly stressful event but a carefully plotted scheme. The defendant took extensive steps in preparation for the offense. Over the course of several days, the defendant hired someone to commit the murder and located a weapon that could be used in the commission of the crime. By acting through intermediaries and by using someone else's handgun, the defendant's apparent goal was to cover up, as well as she could, her own role in the crime. The defendant's efforts at concealing her responsibility for the murder did not cease with the victim's death. The defendant later induced the victim's husband to go into hiding with one of the children so that they could not testify at trial.

In concluding that death is an excessive sentence in this case, the majority emphasizes that the defendant had no significant history of criminal conduct and observes that the defendant's prior contacts with the police “stemmed from the emotional problems resulting from her relationship with Louia.” Slip op. at 36. The majority overstates this aspect of the defendant's background. Although the absence of a significant criminal record is mitigating, it is not dispositive but is simply one of the various circumstances that the sentencing authority–judge or jury–must consider in determining whether to sentence a particular defendant to death. Ill. Rev. Stat. 1987, ch. 38, par. 9–1(c)(1). We have never held that the death penalty statute is limited in its application to career criminals; in a number of cases, this court has affirmed death sentences imposed against defendants who possessed relatively clean records. See, 
e.g.
, 
People v. Cole
, 172 Ill. 2d 85, 110-11 (1996) (defendant did not have prior criminal record); 
People v. Tenner
, 157 Ill. 2d 341, 357-59, 386-87 (1993) (defendant received probation for burglary conviction in 1968; evidence also presented of reports to police of domestic disputes, and of occasion in which defendant, stopped for traffic violation, was carrying loaded handgun); 
People v. Gosier
, 145 Ill. 2d 127, 139, 149 (1991) (defendant previously received probation for assault of police officer); 
People v. Tye
, 141 Ill. 2d 1, 29-31 (1990) (defendant did not have prior criminal record). As in the present appeal, the capital offenses committed in a number of these cases were ascribed to problems in romantic relationships. See 
Cole
, 172 Ill. 2d 85; 
Tenner
, 157 Ill. 2d 341; 
Gosier
, 145 Ill. 2d 127.

In deciding to impose the death penalty in this case, the trial judge explained, in this bench proceeding:

“[A]nd I have to say that the cold, callous acts of the defendant, the moving force behind the murder of Valerie McDonald, bespeak[] a woman with a malignant heart. These acts outweigh any mitigation which was presented.

We must send a message to the community that the criminal justice system will not tolerate such acts. Any lesser sentence than the maximum would denigrate the seriousness of this offense.”

The majority's decision to vacate the defendant's death sentence in favor of a term of imprisonment accomplishes exactly what the trial judge was seeking to avoid.

The majority properly rejects the defendant's challenge to the adequacy of the evidence of her guilt. The majority errs, however, in vacating the defendant's death sentence as excessive. If the evidence in this case is sufficient to sustain the defendant's convictions, as the majority concludes, then I believe that the evidence is also sufficient to sustain the defendant's sentence of death. See 
People v. Sanchez
, 115 Ill. 2d 238, 276 (1986) (“To be convinced of defendant's guilt is also to be convinced of the ruthless manner in which he acted”). I would therefore reject the defendant's contention that death is an excessive sentence, and I would consider in this appeal the defendant's remaining challenges to the sentencing phase of the proceedings below.

JUSTICES HEIPLE and BILANDIC join in this partial concurrence and partial dissent.