2021 IL App (2d) 190349-U
No. 2-19-0349
Order filed April 19, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Stephenson County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 09-CF-262 |
| MICHAEL D. NORSWORTHY, | ) ) ) | Honorable William A. Kelly, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices McLaren and Jorgensen concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Affidavit reporting that shooting victim recanted his trial testimony of the shooting did not support a colorable postconviction claim of actual innocence where the recantation was positively rebutted by evidence from several other witnesses that defendant shot the victim.

¶ 2   At issue in this appeal is whether defendant, Michael D. Norsworthy, made a substantial showing of actual innocence in his amended postconviction petition. We determine that he did not. Accordingly, we affirm the trial court's order granting the State's motion to dismiss defendant's amended petition.

¶ 3                                          I. BACKGROUND

¶ 4     This case was previously before us on direct appeal. See *People v. Norsworthy*, 2013 IL App (2d) 120238-U. We repeat as much of the background from our prior order as is necessary to resolve the issues in this current appeal.

¶ 5     Defendant was charged with various offenses related to the October 20, 2009, shooting of brothers Tyrone and Tyrane Allen. The counts involving Tyrane charged defendant with attempted first-degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2008)), aggravated battery with a firearm (§ 12-4.2(a)(1)), and aggravated discharge of a firearm (§ 24-1.2(a)(1)). In relation to Tyrone, defendant was charged with attempted-first degree murder.

¶ 6     Evidence presented at defendant's jury trial revealed that, on October 20, 2009, defendant went to LaShanda Williams' house to play cards. Several other people were there, including Tyrone and Tyrane. Although the Allen brothers and defendant had a family-like relationship and had known each other for years, there was some tension between Tyrane and defendant, as defendant was dating the mother of Tyrane's children.

¶ 7     During the gathering at Williams' home, an argument ensued amongst the three men, and they exited Williams' house. Other people at Williams' home also exited the house to see what was transpiring. After a physical and verbal fight outside the home, Tyrane took off running, defendant chased after Tyrane, and Tyrone followed defendant.

¶ 8     Three of the witnesses testified that they saw defendant shooting at Tyrane while defendant chased him. Specifically, Williams, who saw defendant with a gun while he was playing cards, heard gunshots, saw defendant running, and believed that she saw defendant shooting the gun.

¶ 9     Tyrone, who also saw defendant with a gun while playing cards that night, heard defendant threaten to kill Tyrane. Tyrone testified that he saw defendant shooting at Tyrane as he (Tyrone)

chased defendant. Tyrane yelled that he had been hit. Defendant then turned and shot Tyrone in the chest. After the gun was wrestled away from defendant, he fled.

¶ 10    Tyrane testified that, while he was trying to run away from defendant, he turned around and saw defendant shooting at him. Tyrane stated that he was shot in both calves and his arm. After shooting Tyrane, defendant turned around and shot Tyrone.

¶ 11    Two of the witnesses, Shatyra Crider and Lashonda Green, each gave a recorded statement to the police shortly after the shooting. Each statement was admitted as a prior inconsistent statement. See 725 ILCS 5/115-10.1 (West 2008) (a prior inconsistent statement is admissible if the statement is inconsistent with trial testimony, the witness is subject to cross-examination, and the prior statement describes what the witness observed and was recorded).

¶ 12    In her statement, Crider asserted that she saw defendant shooting a gun at the Allen brothers. However, she testified at trial that she was intoxicated on the night in question and had little memory of the events. She claimed that she was also intoxicated when she gave her statement to the police. She was "pretty sure" that she told the police that she saw defendant with a gun, but she could not recall the remainder of the interview. She clarified that she was not denying that she told the police the truth; she just could not remember any of the remaining details.

¶ 13    Green's testimony was equivocal. In her statement, Green told the police that she saw the shooting and that the shots fired came from defendant " 'for sure.' " However, she testified at trial that she did not see anyone with a gun that night, and she denied telling the police that she saw defendant firing a gun. She testified that she was intoxicated when she spoke to the police, and she claimed that she told the police the truth and was also testifying truthfully.

¶ 14    Two of the witnesses believed that defendant had a gun that night, but they never saw defendant shoot the gun. Shannon Thomas testified that he bumped into defendant that night and

felt what he believed was a gun holster underneath defendant's arm. He heard shots being fired, but he did not know from where they came. Lashaun Thompson saw defendant wave a gun and yell something that night. Although Thompson, too, heard gunshots, he never saw defendant shoot the gun.

¶ 15    Two witnesses testified that defendant did not have a gun, and they did not see defendant fire at Tyrane. Jerry Mitchell testified that he never saw defendant with a gun. When defendant began chasing Tyrane, Mitchell turned to leave. He then heard shots being fired and saw flashes coming from behind defendant. Melissa English also testified that she did not see defendant with a gun that night. She stated that she was hiding when she heard shots fired and did not see who the shooter was.

¶ 16    Evidence concerning defendant's version of events and interaction with the police revealed that defendant first spoke to the police the morning after the shooting. Defendant told the police that he was not at Williams' house the night before.

¶ 17    When defendant spoke to the police a second time, he admitted that he was at Williams' house, but he denied shooting at either of the Allen brothers. Defendant told the police that he did not have a gun that night and that, while playing cards, he saw that Tyrone did have a gun. After exiting the home, defendant was approached by Tyrane and Tyrone. Defendant had a verbal and physical conflict with Tyrane. Tyrone fired one shot into the ground. As defendant chased Tyrane, Tyrone fired three more shots. Defendant then attempted to wrestle Tyrone's gun away, and the gun discharged during the struggle. Tyrane came over and punched defendant several times in the face. Tyrone also pistol-whipped defendant in the face. Defendant eventually ran away.

¶ 18    When defendant spoke to the police on the morning after the incident, they saw no injuries to defendant's face.

¶ 19    Defendant's trial testimony was generally consistent with his second statement to the police. Defendant stated that, when he was chasing Tyrane, he heard shots coming from behind him. He turned and saw Tyrone chasing him. Defendant continued to run and duck to avoid being shot by Tyrone. Defendant testified that Tyrone and Tyrane struck him with a bottle and with a gun. He denied that he told the police that he was struck in the face. Defendant explained that his injuries were not visible to the police because he was hit on the brim of his hat and on the top of his head, where his hair would make it difficult to see his injuries.

¶ 20    In closing argument, the State asserted that defendant shot both Tyrone and Tyrane. Defendant argued that Tyrone accidentally shot Tyrane while Tyrone was pursuing defendant as he in turn pursued Tyrane. Defendant also claimed that Tyrone was accidentally shot as they struggled over Tyrone's gun.

¶ 21    The jury acquitted defendant of all charges involving Tyrone. As to the charges involving Tyrane, the jury found defendant guilty of attempted first-degree murder, aggravated battery with a firearm, and aggravated discharge of a firearm. The jury also found that, in committing these offenses, defendant personally discharged a firearm that proximately caused great bodily harm to Tyrane. See 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2008).

¶ 22    Before defendant was sentenced, he told the trial court that he thought his attorney had provided ineffective assistance. The court held a hearing pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984). At that hearing, defendant claimed, among other things, that his counsel was ineffective because he failed to interview and call Robert Wright as a witness. Defendant submitted an affidavit from Wright, who averred that he was at Williams' house on the night of the shooting. Wright saw Tyrone running behind defendant and shooting at him while defendant chased Tyrane. Special counsel was appointed to investigate defendant's claims. Special counsel

reported that, when questioned, Wright affirmed the truth of the statements in his affidavit. However, he admitted that he did not see who shot Tyrane. Rather, after hearing the first shot, he turned away from the scene and suggested to Mitchell that they leave. Wright then walked in the opposite direction of the shooting.

¶ 23 The trial court found that defendant's claims of ineffectiveness were unfounded. Thereafter, the court sentenced defendant to an aggregate term of 31 years' imprisonment.[1] Defendant appealed, arguing that (1) he was not proved guilty beyond a reasonable doubt and (2) his convictions of and sentences for aggravated battery with a firearm and aggravated discharge of a firearm had to be vacated, as they violated the one-act, one-crime rule. We determined that defendant was proved guilty beyond a reasonable doubt, but we vacated his convictions of and sentences for aggravated battery with a firearm and aggravated discharge of a firearm because they violated the one-act, one-crime rule. See *People v. Norsworthy*, 2013 IL App (2d) 120238-U, ¶¶ 30, 37.

¶ 24 Defendant then petitioned *pro se* for postconviction relief. His claims include a claim of actual innocence. He attached Wright's affidavit as well as an affidavit from Michael Daniel. Daniel attested that, in June 2013, he was hanging out with Tyrane. Tyrane told Daniel that defendant did not shoot him. Tyrane said that he had lied about what happened because he wanted

---

[1] The court sentenced defendant to 6 years' imprisonment for attempted first-degree murder plus a consecutive term of 25 years because defendant personally discharged a firearm that proximately caused great bodily harm to Tyrane. See 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2008). The court imposed concurrent terms of six years for aggravated battery with a firearm and four years for aggravated discharge of a firearm.

defendant " 'out of the way.' " Tyrane also stated that his unrelated case was "thrown out" when he testified against defendant. In explaining why he did not come forward sooner, Daniel stated that he did not "know how to get it out their [*sic*] to help [defendant]." Later, Daniel learned from a law clerk that he could write an affidavit attesting to what Tyrane told him. When Daniel was in prison, he encountered defendant and told him about his conversation with Tyrane. Daniel stated in his affidavit that he was willing to testify about his conversation with Tyrane.

¶ 25    Defendant argued that Wright's and Daniel's affidavits established that he was not the person who shot Tyrane.

¶ 26    Defendant's petition advanced to the second stage of postconviction proceedings. Counsel was appointed, and defendant filed an amended petition. Defendant reiterated his claim of actual innocence but now relied on Daniel's affidavit alone.

¶ 27    The State moved to dismiss defendant's petition. It contended that defendant's evidence of actual innocence was not conclusive, because, given the strength of the State's case, Daniel's account of his conversation with Tyrane would not likely change the outcome of defendant's trial.

¶ 28    The trial court granted the State's motion to dismiss, and defendant timely appealed.

¶ 29                                    II. ANALYSIS

¶ 30    At issue in this appeal is whether defendant's amended postconviction petition was properly dismissed. The Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2018)) provides a three-stage process for the adjudication of postconviction petitions. *People v. Johnson*, 2017 IL 120310, ¶ 14. This appeal concerns a dismissal at the second stage.

¶ 31    At the second stage, the defendant bears the burden of making a substantial showing of a constitutional violation. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). In assessing whether that burden has been met, all well-pleaded facts not positively rebutted by the trial record are taken

as true. *Id.* If the court finds that the defendant has not met his burden, the petition is dismissed. *People v. Tate*, 2012 IL 112214, ¶ 10. We review *de novo* a dismissal at the second stage. *People v. Sanders*, 2016 IL 118123, ¶ 31.

¶ 32     Defendant argues that his petition should have survived dismissal at the second stage because he presented a substantial showing that he was actually innocent. See *People v. Henderson*, 2014 IL App (2d) 121219, ¶ 24 ("A claim of actual innocence is cognizable in a postconviction petition because the imprisonment of an innocent person violates the due process clause of the Illinois Constitution, as do procedural barriers to having a claim of innocence adjudicated on the merits."). Whether a defendant has asserted a colorable claim of actual innocence is also an issue that this court reviews *de novo*. *People v. Robinson*, 2020 IL 123849, ¶ 40.

¶ 33     Establishing a claim of actual innocence "is extraordinarily difficult." *People v. Coleman*, 2013 IL 113307, ¶ 94. To succeed on an actual innocence claim, "the supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial." *Robinson*, 2020 IL 123849, ¶ 47. "Newly discovered evidence is evidence that was discovered after trial and that the [defendant] could not have discovered earlier through the exercise of due diligence." *Id.* "Evidence is material if it is relevant and probative of the [defendant's] innocence." *Id.* "Noncumulative evidence adds to the information that the fact finder heard at trial." *Id.* "[T]he conclusive character element refers to evidence that, when considered along with the trial evidence, would probably lead to a different result." *Id.*

¶ 34     "The conclusive character of the new evidence is the most important element of an actual innocence claim." *Id.* "Ultimately, the question is whether the evidence supporting the

postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Id.* ¶ 48. "The new evidence need not be entirely dispositive to be likely to alter the result on retrial." *Id.* "Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." *Id.* For the new evidence to be of such a conclusive character that it would probably change the result at trial, "[w]e must be able to find that [the] new evidence is so conclusive that it is more likely than not that no reasonable juror would find [the defendant] guilty beyond a reasonable doubt." *People v. Sanders*, 2016 IL 118123, ¶ 47.

¶ 35 When a defendant's claim of actual innocence is premised on allegations presented in affidavits, which must be taken as true at the second stage, we consider whether they "are sufficient as a matter of law to establish a colorable claim of actual innocence." *Robinson*, 2020 IL 123849, ¶ 61; see also *Sanders*, 2016 IL 118123, ¶¶ 40, 42. Such an assessment does not include "[c]redibility findings and determinations as to the reliability of the supporting evidence." *Robinson*, 2020 IL 123849, ¶ 61; see also *Sanders*, 2016 118123, ¶ 42.

¶ 36 In his *pro se* petition, defendant based his actual innocence claim on both Wright's and Daniel's affidavits. In his amended petition, defendant relied on Daniel's affidavit alone to show actual innocence. On appeal, defendant acknowledges that Wright's affidavit is not newly discovered evidence, and we agree. See *People v. Snow*, 2012 IL App (4th) 110415, ¶ 21 (evidence available at a prior posttrial proceeding is not newly discovered evidence for purposes of a postconviction claim based on actual innocence). Nonetheless, defendant incorporates Wright's affidavit into his argument, as we note below (*infra* ¶ 42).

¶ 37 Turning to Daniel's affidavit, we note that, even if we were to regard it as newly discovered, material, and not cumulative, we would not regard it as conclusive. If a new trial were

held and Tyrane admitted making the statements to Daniel, Tyrane would be impeached with his trial testimony, which would also be admitted as substantive evidence. See 725 ILCS 5/115-10.1 (West 2008). The recantation of testimony is regarded as inherently unreliable. *People v. Morgan*, 212 Ill. 2d 148, 155 (2004). Moreover, Tyrone's recantation not only conflicts with much of the evidence presented at defendant's trial but is also positively rebutted by the State witnesses' testimony concerning the identification of defendant as the person who shot Tyrane. Thus, the recantation, when considered in light of Tyrane's prior inconsistent trial testimony, would not probably change the outcome of the proceeding. See *Robinson*, 2020 IL 123849, ¶ 73 ("The fact that the affidavit conflicts with, but is not positively rebutted by, the State's witnesses on the identification of the person who killed [the victim] is insufficient to reject it. Instead, it is a reason to allow [the defendant] to proceed, with counsel, on his colorable claim of actual innocence.").

¶ 38    To elaborate, Daniel's assertions, while providing a reason why Tyrane may have falsely accused defendant, do not indicate who (if not defendant) shot Tyrane or how Tyrane knew that defendant was not the one who shot him. The State's evidence, in contrast, specifically established that defendant shot Tyrane. In addition to Tyrane, four witnesses—Tyrone, Williams, Thomas, and Thompson—testified that defendant had a gun. None of these five testified that *Tyrone* had a gun. Both Williams and Tyrone testified that they saw defendant shoot at Tyrane. Although Crider and Green either denied that defendant shot Tyrane or had no memory of the incident, both women told police that defendant was the shooter, and those prior inconsistent statements were admitted as substantive evidence. These witnesses' prior inconsistent statements, admitted for substantive purposes, are not of lesser quality than other evidence and may be accorded the same weight as direct testimony from those witnesses. *People v. McCarter*, 2011 IL App (1st) 092864, ¶ 23, overruled on other grounds by *People v. Reese*, 2017 IL 120011.

¶ 39    Although three witnesses testified that defendant did not have a gun, defendant was the only witness who specifically testified that *Tyrone* had a gun.  Defendant's credibility was certainly called into question at trial, because, among other things, he changed his account of what happened.  Indeed, this court on direct appeal commented at length on the implausibility of defendant's testimony.  Addressing in particular defendant's theory that Tyrane was wounded when defendant ducked shots fired at him by Tyrone, we took judicial notice of the fact that defendant was of large stature, making it unlikely that he could reduce his physical profile enough that Tyrane would receive bullets *in the calves* that were meant for defendant.  *Norsworthy*, 2013 IL App (2d) 120238-U, ¶ 33.  We cannot say that Tyrone's recantation, when added to the trial evidence, would probably change the result on retrial.

¶ 40    Instructive on this point is *People v. Smith*, 177 Ill. 2d 53 (1997).  *Smith* involved a motion for a new trial based on newly discovered evidence, but the standard governing such motions also governs actual innocence claims.  See *People v. Washington*, 171 Ill. 2d 475, 486, 498 (1996).  The defendant in *Smith* was convicted of first-degree murder and conspiracy to commit murder.  *Smith*, 177 Ill. 2d at 58.  At trial, a Cook County jail inmate, Harrison, testified that the codefendant, Golden, told her that the defendant had nothing to do with the murder.  *Id.* at 70.  In her motion for a new trial, the defendant sought to introduce the statements of nine additional jail inmates whom Golden also allegedly told that the defendant was not involved in the murder.  *Id.* at 81-82.  On appeal, the supreme court affirmed the trial court's denial of the defendant's motion.  *Id.* at 83.  In addition to noting that the new evidence was cumulative of Harrison's testimony, the court held that the evidence could, at best, be viewed as impeachment of a prosecution witness, which is an insufficient basis for granting a new trial.  *Id.* at 82-83.  To explain, the court cited the distinction " 'between evidence which impeaches a witness in the sense that it affects the

credibility of the witness, and evidence which is probative in that it presents a state of facts which differs from that to which the witness testified.' " *Id.* (quoting *People v. Holtzman*, 1 Ill. 2d 562, 568 (1953)). The court held that the inmates' statements "[did] not contradict Golden by showing a set of facts different from her testimony." *Id.* at 83. Rather, they consisted largely of out-of-court-statements made by Golden that simply contradicted her trial testimony that the defendant was involved in the murder. *Id.* Therefore, the statements were not sufficient to warrant a new trial. *Id.*

¶ 41    Here, Daniel averred that Tyrane disavowed his testimony that defendant was the one who shot him. Daniel reported Tyrane's explanation for his original account as well as the process by which he decided to come forward with his new account. However, these statements by Tyrane did not constitute a set of facts that conflicted with the facts to which he had testified. The essence of Daniel's affidavit was Tyrane's simple repudiation of his trial testimony. As *Smith* held, such evidence is not a sufficient basis for relief.

¶ 42    We also note that defendant claims that "the evidence from Daniel's affidavit, coupled with the evidence from [Wright's] affidavit[,] *** corroborates [defendant's] claim that Tyrone was the shooter[, and this] would be reasonably likely to change the outcome upon retrial." As noted (*supra* ¶ 36), Wright's affidavit is not newly discovered evidence. Nor is it conclusive evidence. In his interview with special counsel during the *Krankel* proceedings, Wright reaffirmed the claim in his affidavit that he saw Tyrone shooting at defendant as he pursued Tyrane. However, Wright admitted that he did not see who shot Tyrane, because he (Wright) turned away from the scene after the first shot. This admission rendered Wright's claims substantially similar to Mitchell's testimony that he heard shots being fired and saw flashes coming from behind defendant. However, it also rendered Wright's claims inconclusive as to who shot Tyrane. In view of the

substantial evidence at trial of defendant's culpability, Wright's affidavit, even when combined with Daniel's affidavit, does not meet the standard for a colorable claim of actual innocence.

¶ 43                                III. CONCLUSION

¶ 44    For the reasons stated, we affirm the judgment of the circuit court of Stephenson County.

¶ 45    Affirmed.